DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Ottawa County Court of Common Pleas, following a trial to the court, that dismissed appellant's claims of a hostile work environment and racial discrimination brought against his former employer, the Port Clinton City School District. For the following reasons, this court affirms the judgment of the trial court.
 {¶ 2} In support of his appeal, appellant sets forth three assignments of error:
 {¶ 3} "Assignment of Error No. 1
 {¶ 4} "The trial court erred when it ruled against Mr. Farris on his claim of hostile work environment based on race and the trial court's decision is not supported by law.
 {¶ 5} "Assignment of Error No. 2
 {¶ 6} "The trial court erred when it ruled against Mr. Farris on his claim of race discrimination and the trial court's decision is not supported by law.
 {¶ 7} "Assignment of Error No. 3
 {¶ 8} "The trial court abused its discretion by not allowing Mr. Farris to call Rebecca Royster during his case in chief and as a result caused prejudicial harm to Mr. Farris when it ruled against him on his claims of hostile work environment and race discrimination."
 {¶ 9} Appellant was first employed at Port Clinton Junior High in 1981. He started as a substitute teacher. In 1984, he was hired as a part-time teacher and in 1985, he began teaching full-time. Appellant initially taught math and then health and physical education. He also supervised Saturday sessions, part of the disciplinary process. At various times between 1981 and December 1998, when he stopped teaching to take disability leave, appellant coached boys' football, boys' and girls' track and basketball, and girls' softball. He coached at least one sport almost every year, mostly in the junior high but occasionally at the high school level. Throughout his employment, appellant was the only African-American teacher employed in the junior high.
 {¶ 10} In December 2000, appellant filed a complaint in the Erie County Court of Common Pleas containing the following allegations: 1) during his employment with the Port Clinton City School District he was subjected to harassment and discrimination because of his race; 2) appellees were put on notice of the harassment; 3) appellees failed to discipline the offending parties; 4) he was discharged without just cause; 5) he was charged with assault by the parents of a student and 6) he suffered emotional and financial damages as a result of harassment and discrimination.[1] Appellant claimed that throughout his tenure with the school system, authorities did nothing to discipline students he reported had addressed him with a variety of racial epithets. He also claimed that because he is African-American he was given poor teaching and coaching evaluations, was denied numerous coaching positions for which he was qualified, and was denied the opportunity to apply for the position of junior high dean of students in 1995.
 {¶ 11} On January 21, 2001, appellee filed a motion to transfer the case to the Ottawa County Court of Common Pleas due to improper venue. Appellant resides in Erie County but the Port Clinton schools are located in Ottawa County. On January 3, 2003, appellee's motion to transfer was granted. On October 12, 2004, appellee filed a motion for summary judgment. Appellant filed a timely response and on December 16, 2004, the trial court granted summary judgment as to Count 1 (this count attested to jurisdiction over the matter and was not a cause of action), Count 4 (assault and battery) and Count 5 (negligent or intentional infliction of emotional distress). Summary judgment was denied as to Count 2 (hostile work environment) and Count 3 (racial discrimination).
 {¶ 12} This case was tried to the bench for several days beginning March 7, 2005. In addition to the transcript of trial testimony, this court has reviewed the trial depositions of three witnesses and dozens of exhibits.
 {¶ 13} Appellant's first witness was his daughter, Verina Farris. Verina testified her father was "happy, full of life and very upbeat" when he began working at the junior high but became "quiet, withdrawn and unhappy" in the 1990s. She attributed her father's change in attitude to a change in how the staff, teachers and students treated him.
 {¶ 14} Steven Smith testified appellant was his seventh and eighth grade gym teacher and football coach. Smith testified that he heard students use "a lot" of racial slurs in reference to appellant and heard racial slurs from people in the crowds at a few basketball games.
 {¶ 15} Appellant's other daughter, Velissa, testified that she attended some of the basketball games her father coached and heard racial slurs which she believed were directed toward her family. She did not believe Port Clinton teachers or administrators responded in any way. She testified that her father was happy during his early years of teaching but by the 1990s seemed quiet and talked about people not listening to him. Velissa stated that when she went to other schools to watch her father's team play basketball the crowds were sometimes racially hostile.
 {¶ 16} Pricilla Farris, appellant's wife, testified she occasionally was in the junior high while her husband taught there. She said she sometimes heard racial slurs exchanged by the students in the hallways and during sporting events at other schools. She recalled incidents at three other schools when she heard racial slurs by students and another coach. Farris believed her husband spoke to his athletic director after one such incident but testified that the situation did not improve. She also testified her husband put his complaints about all racial incidents in writing. She further testified her husband applied for various head coaching positions which he did not receive. She said her husband quit his job as head girls' softball coach shortly after he started because he was not respected and several players told the school board they did not want him as their coach. She recalled her husband was referred to the intervention program during the 1997-1998 school year, because he was having trouble and needed to become a more efficient teacher. Farris testified that by the mid-1990s her husband began to become withdrawn. As to why her husband went on disability, she indicated he wanted to teach but was being told, "You can't teach like this, you have to teach like this * * *." Farris testified her husband got along well with Dale VanLerberghe, his principal, and Dennis Rectenwald, the school superintendent, until shortly before he was referred to the intervention program.
 {¶ 17} Dale VanLerberghe, junior high principal, testified that his relationship with appellant was very good and said they spoke nearly every day. He further testified appellant's teaching contract was never terminated and said he never recommended that appellant's contract not be renewed. VanLerberghe stated there were a few times during appellant's teaching career when he felt appellant needed to make some improvements. He and appellant discussed those concerns. Appellant never expressed concern over racial slurs being directed toward himself or students by other teams and coaches. He did not recall ever being informed by the superintendent, athletic director or other coaches of any incidents involving racial slurs at games. VanLerberghe testified appellant never told him that when he used the term "degrading act" he was referring to a racial slur. He stated the first time he heard that explanation was when appellant testified in court.
 {¶ 18} VanLerberghe testified appellant wrote him a letter in October 1996, in which he stated that for the past year he had sent students to the dean for various problems, including "* * * racial slurs (me being called nigger) * * *." In the letter, appellant complained he had never been informed of disciplinary actions taken against students he referred to the dean. The principal also testified as to an incident that occurred between appellant and a Caucasian male student in 1995, after the student lost his temper during a gym class. Appellant and the student had a verbal altercation in the locker room and allegations were made that appellant physically forced the student to sit down. VanLerberghe was called to investigate and, when he spoke to the student later, observed some scratches on his neck and back. After VanLerberghe spoke to the student and appellant, he talked to the school superintendent, who informed him he was required to report the incident to the Department of Human Services. Appellant eventually was charged with assault but VanLerberghe recalled that the case was dismissed. The principal testified the notes he made during his own investigation reflect that appellant characterized the incident as a "racial issue." Appellant never explained why he believed the incident had racial implications.
 {¶ 19} VanLerberghe further testified as to an incident in 1997, that led to a Title VII investigation at the school. The incident occurred after appellant reprimanded a student for not doing his work in study hall; the student told appellant to "get off his f***ing back," according to VanLerberghe's recollection. The student was sent to the office. Later, two other students said they heard the boy call appellant a "nigger" on his way to the office. The student received an immediate ten-day suspension and the school requested that its Title VII coordinator conduct an investigation. The coordinator interviewed several students and appellant. He was not able to interview the suspended student because shortly thereafter he was committed to a psychiatric facility and did not return to the school. VanLerberghe's records reflect appellant told the investigator "this type of thing has gone on for years and nothing has been done;" "Certain groups of kids and parents are picking on me;" and "Race is real big in this school, I know. If they don't do something I'll go to the NAACP." To VanLerberghe's knowledge, appellant did not request any other Title VII investigations.
 {¶ 20} VanLerberghe testified that appellant's teaching evaluations went "downhill" during the 1996-1997 and 1997-1998 school years. In appellant's 1998 evaluation, during his last full year of teaching, the principal indicated "needs to improve" and "unsatisfactory" in areas related to classroom management and classroom performance. In the area of pupil/teacher relationships, he indicated one "needs to improve," and the rest "satisfactory."
 {¶ 21} In appellant's last year of teaching, the school changed from a junior high to a middle school concept. VanLerberghe testified appellant appeared upset by the "team" teaching format. He further testified appellant did not apply for the position of dean of students when an opening occurred in 1995. He did not recall appellant mentioning to him that he was interested, or complaining he had wanted to apply but did not know about the opening. He further testified that appellant never brought a student to the office for using a racial slur against him.
 {¶ 22} Teachers Victoria Greer and Jody Gagnon testified to details of the intervention program and disciplinary options available to the faculty, including detention, referral to the office and Saturday sessions. Greer testified she had not observed school authorities tolerating racism within the school and had never heard appellant complain that the administration was lenient in dealing with racism or racial slurs. She further testified she had never been aware of a problem with posting notices for jobs in the school district and had not heard such a problem discussed at any of the union meetings she attended. Gagnon testified she had never heard a student or faculty member use a racial slur in the presence of appellant. Greer did not recall appellant complaining that the administration was not tough enough on racism, nor did she recall appellant raising the issue at any of the faculty meetings.
 {¶ 23} Robert Polachek, athletic director and teacher, recalled appellant was hired as head girls' softball coach in March 1991, and resigned from the position at the beginning of the season on April 4, 1991. Appellant did not give a reason for his resignation. Polachek testified that he had occasion to evaluate appellant's coaching performance. He recalled being concerned because appellant showed a lack of organization and often missed practice. He also was concerned that appellant seemed unable to relate to the other coaches and did not appear to want to spend time with them talking about coaching philosophies, going to the JV games, or attending coaching clinics and camps. Polachek further testified that during his time as a teacher and coach in the Port Clinton schools he heard students use racial slurs but did not hear any slurs used by teachers. He further testified appellant never said he was experiencing racism by other members of the teaching staff or by coaches from other schools. Polachek did not believe the junior high administration tolerated students using racial slurs against teachers or other students. He also never heard appellant raise the issue of racism at faculty meetings.
 {¶ 24} Appellant testified at length regarding teaching and coaching in the Port Clinton schools. Appellant stated that during the 1986-1987 school year non-teachers were being promoted to high school coaching positions, leaving him to coach eighth grade. During the 1989-1990 school year, appellant noticed students starting to use the word "nigger" in school. He testified this continued through the 1991-1992 school year and was directed toward him and other students. When this happened, appellant took the offending student to the principal. Appellant further testified that during the 1992-1993 school year, a student in his class said he would "shoot that nigger's wife, kids and coach." He testified that the following school year, a student said he was going to shoot appellant's family. Appellant spoke to the grandmother of one of the students and the racial slurs stopped although the threats did not. Appellant did not report that situation to the school superintendent.
 {¶ 25} In his rebuttal to an unfavorable coaching evaluation in 1994, appellant said the coach of an opposing team referred to him as a "nigger," and said his head coach and other school officials did not follow up on the problem when he asked for help. Appellant stated he heard racial slurs directed toward him in passing as students walked through the halls. He stated this occurred over 200 times during his years of teaching. Some students reported to him they heard other students use racial slurs. If the student could be identified, appellant would send him or her to the office. He believed the students were never punished, however, because he never saw those students' names on the "behavioral sheets" teachers received from the dean of students.
 {¶ 26} Appellant testified at length regarding the 1995 incident in the locker room which led to the assault charge against him. He characterized the school's response as "racial." He stated that the school let the student get off "scot-free." Appellant also stated he expressed this concern to the principal and superintendent when they discussed the incident. When asked why he believed the handling of the incident was racially motivated, appellant said the student's parents never called him for a conference and most parents who failed to come for conferences with him were prejudiced. The charge was dismissed, but appellant testified that his reputation as a teacher and coach suffered. He further testified that after the incident, his relationship with his family suffered as he withdrew and mistreated them. Appellant spoke to the athletic director about continuing racial slurs but he did nothing to resolve the issue. Appellant did not go to the teacher's union with his concerns because he thought the superintendent could take care of the problem. Appellant testified as to a meeting in early 1994 with several of the coaches, the principal, the athletic director, the superintendent of schools, and the vice principal of the high school. Appellant attempted to explain his concern about racial slurs directed toward him but stated no one took any action and the racial slurs at athletic events continued.
 {¶ 27} Appellant also testified that after he caught a student cheating on a test in 1994, the student's mother and grandmother phoned him and "called me a bunch of racial slurs * * *." At a meeting with appellant and the principal, the student admitted cheating and her mother apologized. Also that year, appellant took two students to the principal for saying he "looked like a jungle bunny" throughout the school year. Appellant testified the students were never punished. Appellant also testified that he took a student to the office for misbehaving and when he returned to the gym there was a piece of paper on the stage "with a KKK contract on me * * *," which said "You better watch yourself." The paper had a student's name on it. Appellant took that student to the office and when the boy was asked to explain his actions, he said it was because "he didn't like niggers." Appellant testified that to the best of his knowledge the student was not disciplined. He testified that during the 1995-1996 school year he had problems with students using racial slurs in his class. Appellant wanted them removed from his class but was told by the principal that the students would not be allowed to drop his class.
 {¶ 28} Appellant testified racial slurs directed toward him and other students continued to be a problem during the 1996-1997 school year. When a student directed a racial slur toward him, appellant took them to the principal. He stated that VanLerberghe would yell at the student and then send him or her back to class. Appellant recalled a teaching "team" meeting at the end of the 1997-1998 school year during which the teachers discussed racial slurs. Appellant also testified he documented racial slurs in his notes or on referrals as "degrading acts." Appellant testified he was interested in the dean of students position in 1995, but did not apply because it was filled before he was able to meet with the principal to discuss it.
 {¶ 29} Appellant testified that during his tenure with the Port Clinton schools he could have been promoted to head girls' basketball coach, junior varsity and varsity boys' basketball, head track coach and head football coach. He was interested in all of the positions and believed he was qualified. In 1985, appellant applied for head girls' basketball coach but someone else was hired. Appellant again applied for the position later that year when the coach resigned but was not awarded the position. Appellant applied for the position a third time in 1996 or 1997, and was not hired. Appellant expressed interest in the opening for junior varsity basketball coach for 1995-1996, but someone else was hired before he completed a formal application. Appellant learned of an opening for varsity football coach in 1990, but did not apply because he was told he did not have enough experience. Appellant also decided not to apply for head track coach in the early 1990s, because he had heard someone else was going to be hired. He learned of an opening for head boys' basketball coach in approximately 1998, but did not apply because he heard someone else was going to get the job. Appellant testified that he knew that the school system did not want to hire a black man as a head coach.
 {¶ 30} By letter dated March 25, 1988, appellant resigned from supervising Saturday sessions and from coaching junior high boys' track, eighth grade girls' basketball and eighth grade football. In his letter, appellant stated he was resigning because he was not being promoted and said he believed he was not receiving any coaching promotions due to his own "leadership deficiency." Appellant did not coach again until the 1990-1991 school year. That year he coached freshman football and boys' basketball and was appointed girls' softball coach. However, appellant resigned as softball coach in April 1991, less than one month after his appointment, without stating a reason. When questioned as to why he resigned, appellant testified that after he applied for the job, the former coach and some players went to the school board. He testified there was a meeting and a "big argument" about his being hired and said some of the players did not want him as their coach. Nevertheless, appellant was given the job. When questioned further as to his resignation, appellant mentioned problems with the former coach, who was "holding a grudge" because appellant was given the contract. He testified that the former coach "talked to parents and the kids against me."
 {¶ 31} Appellant testified he received two unsatisfactory evaluations during his years of coaching, one for track and one for basketball. In appellant's words, the comments indicated he was "trying to turn kids against the other coaches" and was "mainly not being around the coaches."
 {¶ 32} Appellant also testified as to his referral to the intervention program in May 1998. The referral, initiated by six teachers, was discussed in a meeting with the teachers and the chairman of the review board. At that time, appellant was given a written statement of concerns regarding his teaching. Appellant submitted a written response in which he stated his rights as a teacher had been violated. Appellant questioned the allegations in the referral and the means by which the faculty obtained information on his teaching. The intervention was not implemented because appellant decided not to return to teaching for the 1998-1999 school year. Appellant testified that during the 1995-1996 school year he sought psychiatric treatment because he was depressed over the racial problems at his school. Appellant went on disability beginning with the 1998-1999 school year due to the "mental problems" he was experiencing in school. Appellant testified that when his doctor approved him to return to work in 2003, he contacted the Port Clinton schools and was told "they didn't want me back."
 {¶ 33} Carey Clum testified that he became the high school athletic director in 1992, and observed appellant's coaching during the 1992-1993 and 1993-1994 school years. Clum saw that appellant was a "source of frustration" for the head coach, who felt that appellant could perform better but was not doing what he was asked to improve. Clum observed several occasions where appellant had "run-ins" with referees, including one instance where appellant refused to turn in his line-up card when asked. Clum testified that in June 1993, he and head basketball coach Bodager talked to appellant about his skills as a coach. Clum stated appellant clearly had a vast amount of knowledge of the game of basketball. He added, however, that appellant sometimes left his players "in harm's way" by leaving them unattended in the locker room, which he did not want his coaches to do. He further testified appellant several times failed to ride the team bus to games, one time arranging for a parent to ride with the players although the parent was not approved by the board to supervise. Clum said he received a letter from high school assistant principal Mike Schifer in which the principal referred to appellant's behavior at the game as "an embarrassment."
 {¶ 34} Clum further testified that he had received other complaints regarding appellant's behavior at basketball games. In 1994, a referee filed a complaint with the Ohio High School Athletic Association alleging that before a game started, appellant told the referee that if he tried to throw him out of the game he "would go to the NAACP and sue him." Clum testified he received complaints from other schools and during the 19931-994 school year was instructed by the school superintendent to attend appellant's away games. He denied hearing racial slurs against appellant at any away games and said that if he had he would have spoken to an official with the other school about it. He stated that he would not have the authority to take any other action. Clum recalled a letter sent to the Port Clinton Schools from the Huron Schools complaining about appellant's behavior at a game. The school also was contacted by another coach who was disappointed with appellant's actions at a game.
 {¶ 35} Regarding appellant's 1994 evaluation, Clum noted that after the first week or two of the basketball season, appellant was rarely around, did not socialize with any of the coaches in the office, did not attend any varsity or junior varsity practices and attended very few of the basketball games. Clum was concerned because as a result, appellant was unable to share his thoughts with the other coaches and was not available to learn firsthand about their concerns and problems. Clum stated he hired appellant as freshman football coach in 1990, but after two weeks of practice, appellant quit.
 {¶ 36} Clum testified that on June 1, 1995, he told appellant he would be interviewed for the job as head girls' basketball coach. Appellant responded he was withdrawing his name from consideration but later that day told Clum he had been confused and did want to be interviewed. However, one week later appellant again withdrew his name from consideration for the job. There was an opening for head high school boys' basketball coach in 1997, but Clum did not receive an application from appellant.
 {¶ 37} In defense of the school not accepting an application for girls' basketball coach in 1997, when appellant submitted it late, Clum noted that appellant had a history of changing his mind. Clum recalled that appellant resigned from coaching eighth grade football at the beginning of the season in 1987, and did the same thing after being awarded head softball coach in 1990; in 1988, he submitted a letter stating he was not going to apply for any more supplemental contracts at the school, and in 1995, after submitting a letter of intent concerning girls' basketball, he changed his mind twice before finally withdrawing his name. Clum testified that by 1997, he had lost all respect for appellant's ability to coach and deal with students.
 {¶ 38} Principal VanLerberghe testified on rebuttal that he was not aware of appellant's claim that a student in his class had threatened to bring a gun to school and kill him until appellant testified at trial. He stated the student had come to his office after being told to leave appellant's class. The student admitted saying he wished "coach was dead," which was overheard by another student. VanLerberghe testified that if a student had threatened a teacher with a gun he would have reported the incident to the police.
 {¶ 39} He further testified he did not have notes in his file regarding the "KKK contract" and said he would have documented such an incident. He testified he would have talked to the superintendent about turning the incident over to the police. VanLerberghe emphasized that to his knowledge, appellant never documented any situations where students made racial slurs against him.
 {¶ 40} Appellant presented rebuttal witness Rebecca Royster, one of his former students. Royster stated she had a serious drug habit in seventh and eighth grade and used drugs before school. Royster testified she frequently heard students use racial slurs against appellant in class. When asked how appellant handled those situations, she stated that appellant talked to the students about respecting each other and after a while there were fewer occurrences. Royster also testified that the school nurse was in the gym class on one occasion when racial slurs were used.
 {¶ 41} Sur-rebuttal witness Margaret Bodie, the school nurse, testified that she often had reason to be in the gym during appellant's classes. She stated she never heard a student use a racial slur against appellant.
 {¶ 42} Appellee also presented the deposition testimony of three individuals. James Radloff testified he was a teacher with Port Clinton schools for over 30 years, coached numerous sports and was president of the teachers' union for 11 years. Radloff explained that the grievance process is set out in the teachers' contract. Radloff recalled a conversation in which appellant may have discussed a Title VII investigation but could not recall details. Appellant never indicated to Radloff that he wanted to file a grievance with the union against the building administrator for tolerating a racially hostile environment. Radloff further testified appellant never indicated his working environment was racially hostile or that he was hearing racial slurs from students.
 {¶ 43} Clara Dracka testified that she was appointed dean of students in July 1995, and that the position had been advertised. She recalled receiving a notice in her school mailbox and seeing it posted on a bulletin board. She further testified she did not attend any faculty meetings where appellant raised the issue of racial slurs and said he never expressed directly to her any concerns about how she was disciplining students he sent to her office. She did not recall receiving any documentation from appellant requesting that she discipline a student or recall him sending any students directly to her. She did recall appellant sending students to the "time out" table by her office. It was her impression appellant took care of his own discipline by issuing detentions. To her knowledge, appellant never referred any students to Saturday sessions for discipline. Dracka did not recall appellant ever indicating on a detention slip that a student was being disciplined for racial slurs and did not recall disciplining any of his students herself for racial insults. Dracka also testified she was one of the six teachers who recommended appellant's intervention in 1998, because she was concerned about his teaching. Dracka had noticed an increasing number of appellant's students at her "time-out" table and had been told by substitute teachers that he very seldom left his class book or adequate lesson plans for them when he knew he would be absent. The referring teachers were concerned about problems with his teaching preparation and procedures, not establishing reasonable rules for his classroom, his failure to follow the code of discipline established by the teaching team, and his overall difficulty adapting to the team teaching approach.
 {¶ 44} Dennis Rectenwald testified that he was principal of Port Clinton Junior High from 1982 until 1985, and superintendent of the Port Clinton Schools from 1985 until 2002. He testified that when appellant started teaching he often asked for advice on how he could become a better teacher. Throughout the 1980s, he and appellant talked frequently. He did not recall appellant telling him he was experiencing or witnessing racial discrimination in the school. He recalled appellant's teaching evaluations as initially positive but later becoming more critical. By the mid-1990s, he began to see more concerns raised about appellant's classroom performance. Appellant was not following procedures or interacting with other coaches and teachers. He saw appellant becoming more isolated and withdrawn. Rectenwald recalled attending a meeting in 1995, with appellant, the athletic director, head basketball coach and high school principal at which appellant's coaching evaluation was discussed. The subject of racism was raised in connection with incidents at some other schools during athletic events. After that meeting, Rectenwald and other school officials agreed that at least one administrator would attend all away games in which appellant coached. Rectenwald referred to a letter written by a coach from another school in response to the manner in which appellant handled himself at a game, stating he used a lot of profanity. He also testified he received a letter from the principal of another school after an athletic event which referred to "threatening comments" made by appellant. Rectenwald testified that after one basketball game an official filed a report with the Ohio High School Athletic Association regarding threats made by appellant. He further testified appellant never approached him as superintendent and said he was experiencing racism in the school.
 {¶ 45} On July 1, 2005, the trial court dismissed appellant's complaint. In its 68-page decision, the trial court demonstrated a thorough consideration of appellant's claims and the extensive evidence presented at trial. The trial court concluded that appellant failed to establish the essential elements of a hostile work environment and that appellant's testimony was not credible. The trial court found that appellant established a prima facie case of racial discrimination in employment but failed to offer any evidence showing appellee was motivated by racial discrimination.
 {¶ 46} The trial court found that "[appellant's] testimony, inconsistencies in his testimony, his perception of certain events, lack of documentation of racial incidents, lack of supporting testimony, and his testimony that degrading comments meant racial slurs, strains [his] credibility to such an extent that there is serious concern whether [he] is testifying to events as they actually occurred, or as he perceives them to have occurred." The trial court found a "substantial question as to whether his testimony actually reflects reality."
 {¶ 47} In his first assignment of error, appellant asserts the trial court's decision as to his claim of a hostile work environment was against the weight of the evidence. Appellant asserts he was subjected to harassment in violation of R.C. 4112, because of his race and that appellee knew or should have known of the harassment.
 {¶ 48} Ohio courts apply federal law interpreting Title VII of the 1964 Civil Rights Act to cases involving violations of R.C. Chapter 4112. Ohio Civ. Rights Comm. v. David RichardIngram, D.C., Inc. (1994), 69 Ohio St.3d 89, 95, 1994-Ohio-515.
 {¶ 49} A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc. (1993),510 U.S. 17, 21 (internal quotation marks and citations omitted). In determining whether there was a hostile work environment, the court looks to the totality of the circumstances. Id. at 23. These circumstances may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Id. The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard the conduct as abusive. Bowman v. Shawnee State Univ. (6th Cir. 2000), 220 F.3d 456, 463.
 {¶ 50} The United States Supreme Court has held that "mere utterance of an * * * epithet which engenders offensive feelings in an employee, * * * does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview."Harris, supra, citing Meritor Savings Bank, FSB v. Vinson
(1986), 477 U.S. 57 (internal quotation marks omitted).
 {¶ 51} To establish a claim brought under R.C. Chapter 4112 against an employer for hostile work environment harassment, a plaintiff must establish: (1) the employee was a member of the protected class; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex or race; (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment; and (5) the existence of respondeat superior liability. Delaneyv. Skyline Lodge, Inc. (1994), 95 Ohio App.3d 264, 270, citingHarris, supra. The federal courts uniformly apply a "known or should have known" test in determining an employer's liability for harassment by nonsupervisory coworkers or nonemployees. SeeFaragher v. City of Boca Raton (1998), 524 U.S. 775;Burlington Industries, Inc. v. Ellerth (1998), 524 U.S. 742.
 {¶ 52} Appellant claims he was subjected to racial slurs repeatedly throughout his tenure with the Port Clinton City Schools. Appellant asserts the evidence presented at trial was legally sufficient to sustain a verdict in his favor and that the trial court's decision was against the weight of the evidence. The trial court found that appellant's allegations were vague, unsupported and uncorroborated, and that his testimony was not credible.
 {¶ 53} We begin with the proposition that we must defer to the trial court as the finder of fact. The trial court was in the best position to view the witnesses, observe their demeanor, gestures and voice inflections, and to use those observations in weighing the credibility of the proffered testimony. SeasonsCoal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80. As such, a reviewing court should not substitute its judgment for that of the trial court. Id.
 {¶ 54} Appellant testified he was repeatedly subjected to racial slurs during class, in the school hallways and at athletic events when he was coaching. He testified that when he heard a student use a racial slur in school he took the student to the principal's office. He also said he spoke to the athletic director about this problem. He testified he took the student who wrote the "KKK contract" to the principal. This testimony conflicts with that of principal VanLerberghe and superintendent Rectenwald. VanLerberghe testified appellant never brought a student to the office for using a racial slur against him and said appellant never expressed concerns over racial slurs. Rectenwald testified he did not recall, either as principal or as superintendent, appellant telling him he was experiencing or witnessing racial discrimination. Appellant further testified that when a student said he was going to shoot appellant's family, he did not report the incident to any of the administrators but handled it by speaking to the student's grandmother. Appellant also testified he did not go to the teachers' union with his concerns because he thought the superintendent could take care of the problem.
 {¶ 55} Teachers Victoria Greer and Jody Gagnon testified they never heard appellant complain that the administration was lenient in dealing with racism or racial slurs. Gagnon did not recall appellant ever raising the issue at a faculty meeting. Athletic director Polacheck testified appellant never told him he was being subjected to racism by teachers or other coaches. He also never heard appellant raise the issue at a faculty meeting. VanLerberghe testified that a Title VII investigation was initiated after two students said they heard another student refer to appellant as a "nigger" on his way to the office after appellant disciplined him. The student received an immediate ten-day suspension.
 {¶ 56} Appellant's rebuttal witness Royster, who admitted to a serious drug habit in junior high and to using drugs before going to school, testified she heard other students use racial slurs against appellant in class. She said the school nurse was in the gym on one occasion when racial slurs were used. The school nurse testified that she never heard students use racial slurs against appellant. Teacher Radloff, president of the teachers' union for 11 years, testified appellant never indicated his working environment was racially hostile. Clara Dracka, the dean of students, did not recall appellant sending any students to her to be disciplined for racial insults and did not recall appellant indicating on a detention slip that a student was being disciplined for racial slurs toward him. She further testified appellant never expressed directly to her any concerns about how she was disciplining students.
 {¶ 57} This court has thoroughly reviewed the record of proceedings in the trial court. We have looked at the totality of the circumstances as depicted by the evidence offered at trial, mindful that the trial court carefully weighed the credibility of the many witnesses. Clearly, appellant is a member of a protected class. Also, it is clear from appellant's testimony that he perceived his work environment to be abusive. However, the evidence presented did not show that the incidents to which appellant testified were severe or pervasive enough to alter the conditions of his employment. It is difficult to determine from appellant's testimony the frequency of the conduct of which he complained since he alleges the racial slurs occurred from shortly after he began teaching in 1981, until he went on disability in 1998. There is little or no evidence that the incidents of racial slurs unreasonably interfered with appellant's job performance. It appears from the testimony that many of the incidents of racial slurs involved comments made by students not directly toward appellant but while they were in the hallways or other locations. Appellant's teaching evaluations were excellent until the mid-1990s. Appellant was happy with his job and, by his own testimony, had an excellent working relationship with his principal and superintendent. Appellant did not show that his workplace was "permeated with discriminatory intimidation, ridicule and insult." His case was lacking in documentation of the incidents of which he complained. The record reflects, by his own testimony and that of the other witnesses, that he tended to handle incidents on his own, talking to students and issuing detentions, rather than involving the principal, dean of students or superintendent.
 {¶ 58} Our findings as to appellant's claims that he was faced with a hostile work environment should in no way be construed as making light of any incident in which he was confronted with racial slurs or epithets. It appears that some of the students through the years were racially intolerant and insensitive. This court does not believe appellant fabricated all of the incidents about which he testified. However, the evidence in this case is insufficient to support a reversal of the trial court's findings as to the claim of a hostile work environment. Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 59} In his second assignment of error, appellant asserts he experienced adverse employment actions because he was not awarded the dean of students job in 1995; he twice applied for and was not named head coach for girls' varsity basketball (1985 and 1987); he was not named head coach for varsity football (1990-1991), varsity track (1990s), and varsity boys' basketball (1997-1998); he was not awarded the junior varsity basketball coaching position in 1995; he was assaulted by a white student on school property and the school did nothing to punish the student; he was called "nigger, jungle bunny, monkey and many other racial slurs by and received death and kkk threats from white students on school property" while appellee did nothing; and he was placed in the intervention program although his job performance for 16 years was good. Appellant further asserts that as a result of the foregoing, he was constructively discharged from his employment with the school.
 {¶ 60} In general, a prima facie case of racial discrimination under the test set forth in McDonnell DouglasCorp. v. Green (1973), 411 U.S. 702, requires a plaintiff to establish he or she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position either lost or not gained; and (4) the position remained open or was filled by a person not of the protected class. It is not disputed that appellant, an African-American, is a member of a protected class.
 {¶ 61} As to the second requirement established by McDonnellDouglas Corp., supra, constructive discharge, if found to have occurred, qualifies as an adverse employment action. See Hoon v.Superior Tool Co. (Jan. 24, 2002), 8th Dist. No. 79821;Policastro v. Northwest Airlines, Inc. (C.A.6, 2002),297 F.3d 535, 539.
 {¶ 62} "The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Mauzy v.Kelly Services, Inc. (1996), 75 Ohio St.3d 578, 1996-Ohio-265, paragraph four of the syllabus.
 {¶ 63} In applying this test, "courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the `discharge' label. No single factor is determinative. Instead, a myriad of factors are considered which might include reductions in sales territory, poor performance evaluations, criticism in front of co-employees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group." Mauzy at 589. A finding of constructive discharge "requires an inquiry into both the objective feelings of an employee, and the intent of the employer. A constructive discharge exists if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Yates v.Avco Corp. (C.A.6, 1987), 819 F.2d 630, 636-37 (citations omitted). A plaintiff must show that the employer intended and could reasonably have foreseen the impact of its conduct on the employee. Id.
 {¶ 64} Courts apply an objective test when determining whether a constructive discharge has occurred. See Mauzy,
supra, 75 Ohio St.3d at 588. Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions. Mayo v. Kenwood Country Club, Inc.
(1999), 134 Ohio App.3d 336, 341, citing Garner v. Wal-MartStores, Inc. (C.A.11, 1987), 807 F.2d 1536, 1539.
 {¶ 65} Appellant relied at trial on his firmly held conviction that once he was referred to the intervention program in 1998, it would only be a short time until his employment was terminated. He provided no support for this claim. He was jumping to conclusions and assuming the worst. It was not reasonable for appellant to feel compelled to resign under the circumstances as they existed. Appellee's actions did not indicate termination was imminent. The referral form completed by the teachers who recommended appellant's intervention clearly expressed their areas of concern with regard to his teaching preparation and procedures, classroom management and discipline, and professional responsibility. The referral explained in detail the areas in which appellant needed to improve, which could have been helpful to him in the coming school year.
 {¶ 66} Appellant did not show that appellee's actions made his working conditions so intolerable that a reasonable person in his shoes would have felt compelled to resign. Recommendation for the intervention program and not receiving every coaching position he desired during his 17-year teaching career did not create an intolerable situation. As to appellant's claims he was the victim of racial slurs and other racist actions, again, we are unable to find those conditions led to a constructive discharge. This argument is without merit.
 {¶ 67} Having determined there was no constructive discharge in this case, we will consider other potential adverse employment actions. The Sixth Circuit has stated that an adverse employment action involves "significantly diminished material responsibilities," including "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation." Kocsis v. Multi-Care Mgmt.,Inc. (C.A.6, 1996), 97 F.3d 876, 886. The adverse action need not result in pecuniary loss, but must materially affect the terms and conditions of the plaintiff's employment. Peterson v.Buckeye Steel Casings (1999), 133 Ohio App.3d 715. Changes in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action. Kocsis, supra.
 {¶ 68} Appellant complains because he was not hired as dean of students in 1995. However, the evidence shows he did not apply for the position. He also argued the opening was not posted through the usual channels. Several witnesses testified to the contrary.
 {¶ 69} Appellant also argues that the school discriminated against him by not hiring him for numerous head coach positions. The record does not support this claim. Appellant was appointed head girls' softball coach in 1991. He resigned from the position shortly after the season started. In his letter of resignation dated April 4, 1991, appellant did not give a reason for leaving the job. He did not indicate that racial discrimination was a factor. In fact, he stated, "A special thank you * * * to all you fine people of the board of education. You have always been fairwith me and I honestly appreciate the contracts in football,basketball, * * * and also Saturday sessions." (Emphasis added.) Appellant's words do not indicate a concern about racial discrimination.
 {¶ 70} During appellant's 17 years of teaching, he held 25 coaching jobs. He voluntarily resigned from six of them. In addition to resigning as head girls' softball coach, appellant over the years resigned as coach of the eighth grade football team, eighth grade girls' basketball, and seventh and eighth grade boys' track. Appellant also resigned as freshman football coach in 1990, just before the season started. The trial court heard testimony that in 1995, appellant submitted a letter of intent regarding coaching girls' basketball, changed his mind, changed his mind again saying he was interested, and finally withdrew his name from consideration.
 {¶ 71} The record does not support appellant's claim of adverse employment actions. Although appellant was not awarded all of the head coach positions he wanted, it must be kept in mind that he was hired to be a teacher. The coaching positions, of which appellant received many, were supplemental. Appellant's job responsibilities as a teacher were never diminished, he was not terminated or demoted, his salary was not reduced and he did not lose any of his benefits.
 {¶ 72} Appellant also cites the handling of the incident with the student in the locker room as an example of an adverse employment action. From all accounts in the record, that unfortunate incident appears to have been handled appropriately. There were no witnesses and appellant and the student had somewhat conflicting stories. The principal testified he spoke to the student and reported the incident to the Department of Human Services as required by law. The school cannot be held responsible in any way for the student's parents filing an assault charge against appellant. The incident was not an adverse employment action.
 {¶ 73} This court has thoroughly reviewed the testimony and the exhibits presented by both parties. There was insufficient evidence of adverse employment action to support appellant's claim of race discrimination. Appellant testified as to incidents over the years in which students, both in his school and at away athletic events, referred to him with racial epithets. However, two witnesses who served as principal of the junior high while appellant was there, the dean of students, and several other teachers testified appellant never sent students to them to be disciplined for racial slurs in his classes or complained to them that it was occurring. Appellant was not able to document any of the incidents. Appellant simply has not shown through documentation that incidents motivated by racism occurred throughout his years of teaching; further, his testimony that he repeatedly reported such incidents to his superiors is in conflict with that of numerous other witnesses. Accordingly, appellant's second assignment of error is not well-taken.
 {¶ 74} In his third assignment of error, appellant asserts the trial court erred by not allowing him to call Rebecca Royster during his case in chief. Royster was not on appellant's witness list. However, she was allowed to testify in rebuttal.
 {¶ 75} Appellant has not offered any support for his claim that he was prejudiced by the delay in presenting Royster's testimony. Further, the trial court has vast discretion in the admission and control of the evidence used at trial. Orwick v.Orwick, 7th Dist. No. 04JE14, 2005-Ohio-5055, ¶ 53. Additionally, Evid.R. 611(A) grants the trial court discretion to control the mode and order of witness interrogation. Based on an examination of the record and the law, we find that the trial court did not abuse its discretion in this regard, and appellant's third assignment of error is not well-taken.
 {¶ 76} On consideration whereof, this court finds that substantial justice was done the party complaining and the judgment of the Ottawa County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Arlene Singer, P.J. William J. Skow, J. Dennis M. Parish, J.
concur.
[1] Appellant named as defendants the Port Clinton City School District and "Jane and/or John Doe, et al., Addresses Unknown." There is no indication in the record of service ever being completed on Jane Doe or John Doe. In this decision, "appellee" refers to the Port Clinton City School District. No other individuals or employees of the school district were named.