DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Jerry Isbell, appeals an entry of summary judgment in favor of appellee, Johns Manville, Inc., in this racial discrimination case. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On May 12, 2005, Isbell filed a complaint against Johns Manville, Inc. alleging breach of an implied employment contract and race discrimination. The trial *Page 2 
court granted Johns Manville's motion to dismiss the implied contract claim on grounds that Isbell was subject to a collective bargaining agreement. Following discovery, the parties filed cross-motions for summary judgment. The trial court granted the motion filed by Johns Manville and denied that filed by Isbell.
 {¶ 3} The facts relevant to a determination of the instant motion are as follows. Isbell is an African-American male who worked at Johns Manville from July 8, 1991 until July 2, 2003, when he was terminated from his job. Isbell's termination was effected following a series of performance problems that occurred during the period of June 2002 through June 2003. At the time of his termination, Isbell worked as a furnace tender and was a member and steward of the Teamster's Local 20.
 {¶ 4} Before 2002, Johns Manville had a single, "traditional," system of discipline for union employees. Under that system, correction of employee performance problems would begin with verbal and written warnings and would progress to suspension and, ultimately, to discharge.
 {¶ 5} By 2002, Johns Manville had adopted, as an alternative — and purportedly less punitive — approach to resolving performance problems, a system known as "performance counseling".[1] Performance counseling consists of three phases: Phase I involves clarification of the employer's expectations; Phase II involves obtaining the *Page 3 
employee's commitment to change; and Phase III involves a decision by the employee as to whether or not he wishes to continue employment with the company.
 {¶ 6} Phase I, or "clarifying expectations", begins after an employee has been made aware of a problem and either communicates an unwillingness to change or continues the objectionable behavior. At this point, management clarifies the company's expectations, and the employee and supervisor reach a mutual understanding regarding the problem and the actions necessary to resolve the problem.
 {¶ 7} Phase II, or "commitment to change," begins if, after clarifying expectations, further problems arise or persist. In such case, management works with the employee to develop a commitment to resolving deficiencies, and the employee commits in writing to a specific action plan that will correct the problem.
 {¶ 8} If, despite clarifying expectations and developing commitment, the employee still violates company policy, the employee proceeds to Phase III, the "decision-making" phase. This is the employee's last opportunity to correct his or her behavior. The employee is given a day to consider whether he or she wants to continue to work with the company. If the employee decides to continue employment, but violates company policy again, the employee is subject to termination.
 {¶ 9} Under Johns Manville's union contract, discipline is removed from consideration and the employee moves back a step in the disciplinary process 12 months after each offense. This "drop off rule applies to both traditional discipline and performance counseling. *Page 4 
 {¶ 10} In the ten months before he was terminated, Isbell was disciplined as follows in accordance with the performance counseling procedure. In June 2002, Isbell's supervisor, Franklin McCord, Jr., counseled Isbell for having reading material at his jobsite and for failing to wear personal protective equipment.
 {¶ 11} In August 2002, McCord met with Isbell and Isbell's union representative, Paul Konwinski, to discuss Isbell's continuing failure to wear personal protective equipment. Johns Manville characterizes this meeting as a "clarification of its expectations" of Isbell.
 {¶ 12} On September 19, 2002, Isbell's new supervisor, John Karamol, found Isbell resting in the furnace tender room with his head down and eyes shut. Karamol roused Isbell and counseled him, but did not advance him to the next level of performance counseling.
 {¶ 13} On September 25, 2002, Karamol twice found Isbell resting in the furnace tender room, again with his head down and eyes shut. Karamol counseled Isbell about not resting at work. Isbell told Karamol he was thinking about his brother, who was gravely ill. Because of Isbell's personal circumstances, Karamol did not advance Isbell to the next phase of performance counseling.
 {¶ 14} Isbell's brother died on September 30, 2002. Isbell took several days of leave, then returned to work. In early October 2002, Karamol observed Isbell resting in the forming room with his head down and eyes shut. *Page 5 
 {¶ 15} On October 10, 2002, Karamol and Karamol's supervisor, Matt Brown, met with Isbell and Isbell's union representative to discuss Isbell's frequent sleeping at work. Because Isbell's brother had recently died, Isbell was not formally disciplined.
 {¶ 16} On November 26, 2002, at about 12:45 a.m., Karamol saw Isbell with his bare hands in a chopper that was not locked out. Karamol told Isbell to put on his gloves. Two hours later, Karamol again saw Isbell working without his gloves, and again instructed him to put them on. At 4:45 a.m. on the same date, Karamol saw Isbell resting in the furnace tender room with his head down, eyes closed, and his feet on a bench. Karamol had to grab Isbell's shoulder to get his attention.
 {¶ 17} Brown and Karamol met with Isbell and his union steward on November 27, 2002. They discussed Isbell's pattern of problems, including his failure to wear personal protective equipment and his frequent resting on the job. They told Isbell that his problems were serious and that if he did not correct these problems he would not be able to continue his employment with Johns Manville.
 {¶ 18} After the meeting, Isbell wrote a letter wherein he stated, "From this day forward I will wear the protective gear that is required." Also in the letter was an admission that he had been sitting on a chair with his head down. His statement in regard to the resting incident was, "I realize that whether I was sleeping or not, this is not what Johns Manville pays me to do." Isbell did not grieve this disciplinary action.
 {¶ 19} Despite his written commitment to change, on April 28, 2003, Isbell's supervisor again caught him resting. Brown, Karamol, Human Resources Supervisor *Page 6 
Kelly Crawford, and a union committeeman met with Isbell on May 1, 2002 to discuss his continuing violations of company policy (including both resting and safety violations) and to determine whether he wanted to continue to work at Johns Manville. The company identifies this meeting as the "decision-making discussion." At this time, Isbell said that he wanted to continue his employment and understood that future incidents would result in his termination. Brown expressed confidence in Isbell's ability to succeed. Isbell did not grieve this disciplinary action.
 {¶ 20} On June 26, 2003, Brown saw Isbell reading a newspaper in his area. Instead of terminating Isbell, Brown informally told him to get rid of the newspaper.
 {¶ 21} On June 27, 2003, Brown and Karamol caught Isbell resting again. Brown was in the plant early to meet with midnight shift employees. When Brown and Karamol entered the forming room, they saw Isbell sitting in a chair with his head in his hands, his body bent at the waist, his head and shoulders leaning forward, and his elbows on his knees. Brown pointed at Isbell, and the other employees in the room simply shook their heads. When Brown approached Isbell, he saw that Isbell's eyes were closed. Isbell did not react when Brown and Karamol entered the area or when Brown approached him. When Isbell did finally react, he jumped up and said, "I'll bet you thought I was sleeping," and left the room.
 {¶ 22} Karamol, Brown and Crawford met with Isbell and a union representative at the end of Isbell's shift. Isbell denied that he was sleeping or resting, and said that he had seen Brown approaching and told other employees in the area that Brown was *Page 7 
coming. According to Isbell, he then threw a bushing into the chopper, got glass in his hand, and sat down to remove it.
 {¶ 23} Brown decided to investigate Isbell's claims. When he asked Isbell's co-workers whether Isbell had told them Brown was coming, they answered no. Brown also obtained technical reports from the furnace to verify Isbell's claim that he threw a bushing. The reports showed that no bushing had been thrown at, or even near, the time or the location claimed by Isbell. Despite the inconsistencies between Isbell's story and what Brown, Karamol, and the other witnesses observed, Brown told Isbell that if they could verify that he had thrown a bushing, the company would give him the benefit of the doubt and forget the whole thing.
 {¶ 24} After more than two hours of meetings and investigation, Brown suspended Isbell pending termination. As stated by Brown, "[W]hat we struggled with was that none of it matched up * * *. We have an employee in the last step of performance counseling and they are not being truthful, we can't get to the bottom of it."[2] *Page 8 
 {¶ 25} Isbell was terminated following a hearing at Johns Manville on July 2, 2003.
 {¶ 26} The union grieved Isbell's termination through final and binding arbitration. At the arbitration hearing, the union stipulated on the record that Isbell had not been truthful when he told Brown that he had been working on a bushing on the morning of June 27, 2003. The union cross-examined Johns Manville witnesses and presented its own witnesses and exhibits. The union argued to the arbitrator that the company's termination of Isbell violated the collective bargaining agreement, that the company could not establish that Isbell was actually sleeping on June 27, 2003, and that the company treated Isbell more harshly than other employees who were caught resting at work.
 {¶ 27} On July 15, 2004, the arbitrator issued a written award denying the grievance and upholding Isbell's discharge. The arbitrator found that Johns Manville had proved that Isbell was asleep or resting on June 27, 2003 and that Johns Manville "had just cause to terminate his employment, given his position in the Performance Counseling system that the Company used." The arbitrator considered and rejected the union's claim of differential treatment, stating as follows:
 {¶ 28} "* * * The record indicates that each employee found sleeping has progressed through the progressive discipline system depending on the number of *Page 9 
infractions that he had. The unchallenged testimony of Mr. Brown was that the Grievant had been given more chances because of his brother's illness and death than other employees had. The Union has failed to show that the Company acted arbitrarily towards him, or establish that there was disparate treatment of the Grievant in this case. Variations in penalties are allowed where there are variations in circumstances. There is a difference between a situation where the employee has been warned and disciplined for the very same offense on numerous occasions, as here, and one where it is the employee's first offense, or where the second employee is not at the same stage in the progressive discipline system as the first employee. The Union has failed to show that the circumstances regarding the other employees who were found sleeping were the same as those in this case."
 {¶ 29} Neither Isbell nor the union took any action to overturn the arbitrator's award.
 {¶ 30} Isbell timely appealed the trial court's entry of summary judgment, raising the following assignments of error:
 {¶ 31} I. "THE TRIAL COURT RECORD ESTABLISHES A GENUINE ISSUE OF MATERIAL FACT TO WHICH REASONABLE MINDS COULD ARRIVE AT DIFFERENT CONCLUSIONS."
 {¶ 32} II. "PLAINTIFF ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION BASED ON THE RECORD." *Page 10 
 {¶ 33} III. "PLAINTIFF PROPERLY FILED THE DEPOSITION TRANSCRIPTS OF FRANKLIN MCCORD AND DWAYNE BRAXTON WHICH CLEARLY ESTABLISH A GENUINE ISSUE OF MATERIAL FACT."
 {¶ 34} Because appellant's first and second assignments of error involve overlapping issues, they will be considered together in our analysis.
 {¶ 35} We note at the outset that an appellate court reviewing a trial court's granting of summary judgment does so de novo, applying the same standard used by the trial court. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. Civ.R. 56(C) provides:
 {¶ 36} "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as considered in this rule. * * *"
 {¶ 37} Summary judgment is proper where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) when the evidence is viewed most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, a conclusion adverse to the nonmoving party.Ryberg v. All state Ins. Co. (July 12, 2001), 10th Dist. No. 00AP-1243, citing Tokles Son, Inc. v. Midwestern Indemnity Co. (1992),65 Ohio St.3d 621, 629. *Page 11 
 {¶ 38} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the non-moving party's claims.Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once this burden has been satisfied, the non-moving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id.
 {¶ 39} A plaintiff seeking to establish a claim for race discrimination must present a prima facie case of racial discrimination.Williams v. City of Akron, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 9-10. The presentation of a prima facie case "`creates a presumption that the employer unlawfully discriminated against the employee.'" Id., ¶ 11, citing Texas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248,254.
 {¶ 40} As in the instant case, a prima facie case may properly be framed as requiring the plaintiff to prove: (1) that he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for his position; and (4) that he was treated less favorably than a comparable person who was not a member the protected class. See Williams, supra, ¶ 26, and Lennon v. Cuyahoga Cty.Juvenile Court, 8th Dist. No. 86651, 2006-Ohio-2587.
 {¶ 41} That the first two elements of the prima facie case have been satisfied in this case is clear and undisputed. What is disputed is whether the third and fourth elements have been satisfied. *Page 12 
 {¶ 42} We begin with an examination of the third element, which requires Isbell to show that he was qualified for his position. "[T]o establish whether a person is `qualified,' the plaintiff must demonstrate not only that [he] was capable of performing the work, but that [he] also met the employer's legitimate needs and expectations." Hamilton v. Sysco FoodServs. Of Cleveland, Inc., 170 Ohio App.3d 203, 2006-Ohio-6419, ¶ 34; see, also, Ebright v. Video News Super Stores, (July 6, 2001), 6th Dist. No. L-00-1369. "When confronted with [a] defendant's motion for summary judgment cataloguing * * * numerous documented instances of dissatisfaction with plaintiffs performance level, the burden [is] upon plaintiff to come forward with affidavits or other acceptable forms of admissible evidence to contradict or rebut the employer's history of frustration and dissatisfaction with [the defendant's] work and attitude. Neubauer v. A.M. McGregor Home Corp. (May 19, 1994), 8th Dist. No. 65579.
 {¶ 43} As indicated above, the record in this case abundantly demonstrates that in the 12 months before Isbell was terminated, he was counseled (informally and formally) for various violations of Johns Manville rules and he proceeded through each phase of the company's performance counseling system of discipline. Isbell, for his part, has produced no proper evidence of his own to contradict or rebut Johns Manville's history of dissatisfaction with his performance.[3] Viewing the evidence most strongly in favor of Isbell, reasonable minds can come to but one conclusion, and that is that Isbell was not meeting Johns Manville's legitimate expectations at the time he was terminated. For this *Page 13 
reason alone, Isbell's first and second assignments of error are properly found not well-taken.
 {¶ 44} Even assuming, arguendo, that Isbell could establish that he was qualified for his position, he must still demonstrate that he was treated less favorably than a comparable non-minority. The law is clear that in order for this element to be successfully established, the parties to be compared must be similarly-situated in all respects; that is, they "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Atkinson v. AkronBd. of Edn., 9th Dist. No. 22805, 2006-Ohio-1032, ¶ 28, citingMitchell v. Toledo Hosp. (C.A.6, 1992), 964 F.2d 577, 583. Employees are not similarly situated in all relevant respects if there is a meaningful distinction between them which explains the employer's treatment of them. Koski v. Willowwood Care Ctr. of Brunswick, Inc.,158 Ohio App.3d 248, 2004-Ohio-2668, ¶ 17, citing Ercegovich v. Goodyear Tire RubberCo. (C.A.6, 1998), 154 F.3d 344, 353.
 {¶ 45} Isbell claims that a Caucasian employee, Rick Rodgers, was also caught sleeping on the job, but was not terminated. We must now determine whether Rodgers was similarly situated to Isbell in all relevant respects.
 {¶ 46} On April 15, 2000, Rodgers received a written warning under the traditional discipline system for resting on the job. More than a year later, on May 24, *Page 14 
2001, Rodgers received a final written warning for sleeping. The record does not show that Rodgers had any additional offenses for the next two years.
 {¶ 47} After Johns Manville introduced the performance counseling system, Rodgers received the following additional discipline. On October 5, 2003, he was cited for sleeping, with the result being a "clarification of expectations" meeting. On December 7, 2003, he was caught resting, and was immediately advanced to the next level of performance counseling, "commitment to change." On February 9, 2004, he was again caught resting, and, again advanced to the next level of performance counseling, the "decision-making phase." Finally, On February 3, 2005, Rodgers was suspended pending investigation in connection with another alleged resting incident — this one said to have taken place on January 30, 2005.[4] Rodgers has not had any issues with resting or sleeping on the job since February 2005.
 {¶ 48} Upon our review of the foregoing, we conclude that although Isbell and Rodgers had the same supervisors, they do not have comparable records and, thus, they are not similarly-situated. Isbell had no less than 11 documented rule violations in the 12 months before his discharge. In the two months after the "clarification of expectations" meeting, Johns Manville informally counseled Isbell four times for violating its rules. *Page 15 
Only when Isbell had violated rules for a fifth time was he advanced to the "commitment to change" level of performance counseling.
 {¶ 49} Rodgers, by contrast, was advanced to "commitment to change" after just his first rule violation following his "clarification of expectations". Unlike Isbell, Rodgers did not get the benefit of informal counseling.
 {¶ 50} Both Isbell and Rodgers advanced to "decision-making" after committing to change their behavior. Unlike in Rodgers' case, Isbell's supervisors essentially ignored his first violation following that phase, and acted only on the second. In addition, both of Isbell's violations came within two months of his reaching the "decision-making" phase.
 {¶ 51} Rodgers, on the other hand, had only one incident of resting, and that occurred approximately 11 months after he had reached "decision-making." At that point, he was suspended pending investigation (despite the fact that, by that time, pursuant to the union contract rules, Rodgers' "clarifying expectations" and "commitment to change" offenses had fallen off and he had moved back two steps in the performance counseling system).
 {¶ 52} Unlike Isbell, Rodgers improved his disciplinary record by going for long periods of time without any offenses. Isbell was terminated following his many offenses in the 12 months before his discharge. Isbell has not presented evidence of any similarly-situated employee with a comparable record. As a result, he cannot establish a prima facie case of discrimination. *Page 16 
 {¶ 53} For all of the foregoing reasons, Isbell's first and second assignments of error are found not well-taken.
 {¶ 54} Finally, we consider Isbell's third assignment of error, wherein he argues that he properly filed the deposition transcripts of witnesses Franklin McCord and Dwayne Braxton, and that those documents establish a genuine issue of material fact. We note that this court previously determined in a decision and judgment entry denying Isbell's motion to supplement the record that it was for the trial court to determine: (1) whether the subject depositions were part of the trial court record, and (2) whether they should be included in the record on appeal. Because there is nothing in the record to suggest any subsequent determination by the trial court regarding this matter, appellant's third assignment of error is necessarily found not well-taken.
 {¶ 55} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
Peter M. Handwork, J., Arlene Singer, J., William J. Skow, J., CONCUR.
[1] Before April 2003, management decided whether to use traditional or performance counseling. After April 2003, employees were allowed to choose between the two types of discipline.
[2] We note that the details concerning Isbell's performance counseling were testified to at arbitration by Isbell's union representatives and other Johns Manville employees, and were acknowledged in various affidavits by Johns Manville employees. In addition, corroborating disciplinary memoranda were authenticated and admitted at arbitration without objection. Although Isbell, at deposition, denied many of the alleged instances of performance counseling and denied knowledge of the related disciplinary memoranda, we find that those self-serving statements, uncorroborated by any other evidence, cannot avail him as against a well-supported summary judgment motion. See Hooks v. Ciccolini, 9th Dist. No. 20745, 2002-Ohio-2322, ¶ 12; see, also, Greaney v. Ohio Turnpike Comm., 11th Dist. No. 0012,2005-Ohio-5284 ("Permitting a nonmoving party to avoid summary judgment by asserting nothing more than `bald contradictions of the evidence offered by the moving party' would necessarily abrogate the utility of the summary judgment exercise. Courts would be unable to use Civ.R. 56 as a means of assessing the merits of a claim at an early stage of the litigation and unnecessarily dilate the civil process.")
[3] See fn. 2, supra.
[4] At Rogers' suspension hearing, the union argued that suspension was improper because Rodgers had been on his break when his supervisor, Karamol, observed him resting. Testimony by Crawford indicates that because Karamol had failed to fully investigate the incident at the time it occurred and, also, had failed to notify Rodgers or the union on the date of the incident that discipline would follow, the company was ultimately forced to reinstate Rodgers without any additional discipline. Karamol was counseled for failing to take immediate action in that instance. *Page 1