[Cite as *Williams v. PNC Bank, N.A.*, 2022-Ohio-4287.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| ANTOINE WILLIAMS, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 111452 |
| v. | : | |
| PNC BANK, N.A., ET AL., | : | |
| Defendants-Appellees. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 1, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-940278

### *Appearances:*

The Spitz Law Firm, LLC, and Fred M. Bean, *for appellant*.

Seyfarth Shaw LLP, Katherine Mendez, Sharilee K. Smentek; Perez & Morris, LLC, and Jo A. Tatarko, *for appellees*.

EILEEN A. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant Antoine Williams appeals an order of the Cuyahoga County Court of Common Pleas granting summary judgment on his race-discrimination claim in favor of the defendants-appellees PNC Bank, N.A. and Stephanie K. Reusser ("PNC Defendants").

{¶ 2} Although we find that the trial court erred when it concluded that Williams had not established a prima facie case of discrimination, our standard of review allows us to fully consider the burden-shifting framework relevant to his claim. After doing so, we determine that the defendants were entitled to summary judgment. For these reasons, as set forth more fully below, we affirm.

## I. Factual Background and Procedural History

### A. Williams' Career From 2006 Through Becoming Bank & Business Center Manager at the Chagrin-Brainard Branch

{¶ 3} Antoine Williams is African American. PNC Bank, N.A. ("PNC") is a foreign national banking association that has branches in Ohio.

{¶ 4} PNC hired Williams as a bank teller in 2006. Williams then entered a PNC management-training development program. He transitioned through various banking roles over the next five years, culminating in a position as an acting assistant manager. James Muraco was Williams' supervisor at PNC during this time.

**{¶ 5}** In February 2011, Williams resigned from PNC, while in good standing, to take a position as a branch manager with another bank.[1] Williams worked for three years as a branch manager and said he was "highly successful" in that role.[2]

**{¶ 6}** Muraco asked Williams to return to PNC in 2014. Williams applied and interviewed for a position as a branch manager. In September 2014, PNC rehired Williams as a Branch Manager II at its branch located at Shaker Square. Williams testified that from his rehire with PNC until his termination, he "had an awesome career with PNC." Williams described his time at PNC between 2014 and 2018 as "nothing short of awesome" and said that he "became a proficient leader and branch manager." In November 2017, Williams was promoted to a position as a banking center manager at PNC's Mayfield-Richmond branch. Williams'

---

[1] Williams testified that he left PNC in 2011 because he believed PNC was discriminating against him by failing to develop him into a branch manager. He said that most of his peers in PNC's management-training program had been promoted "and I had a hard time figuring out why I was the only one left behind." Williams admitted that PNC had a policy against discrimination and that he could have made an internal complaint if he believed he was the victim of discrimination. He said he chose not to file a complaint with PNC about his discrimination concerns out of fear of retaliation. Williams said that "most employees do not report" discrimination at PNC because, although the report is anonymous, "the manager always get[s] ahold of who reported and what" and "[n]othing happens to the manager, but your career within the bank will go on a downward spiral from retaliation." In this case, Williams does not allege that PNC discriminated against him during his first period of employment. PNC asserts that it "is an equal opportunity employer, with robust policies prohibiting discrimination and harassment because of an individual's protected class, including race, and further prohibiting retaliation against an employee for making a 'good faith' report or complaint of discrimination."

[2] Upon leaving this other bank to return to PNC, Williams filed a claim of racial discrimination against the other bank with the U.S. Equal Employment Opportunity Commission ("EEOC"). Williams described that he believed the bank was placing him in certain branches and setting goals that were "aggressive" based on his race. Williams said that the EEOC investigated his claim and concluded that it was unfounded. Williams applied for a role in a different department with the bank after PNC terminated him.

performance reviews reflect that he consistently met or exceeded expectations at PNC.

{¶ 7} Williams came to work closely with Drew Martin, a regional manager for PNC, who "groomed" Williams to become a vice president and Branch & Business Center Manager at PNC's Chagrin-Brainard branch (the "Branch"). Williams said he worked with Martin "to take the necessary steps to receive the promotion" when that position became available.

{¶ 8} When the position opened, Williams interviewed with Stephanie Reusser for the job. Reusser was the regional manager who oversaw the Branch. This interview was the first time that Williams met Reusser. Williams said that Drew Martin — Reusser's boss — made the ultimate decision to promote Williams to the Branch & Business Center Manager role.

{¶ 9} Williams started as Branch & Business Center Manager at the Branch in early March 2019. In this role, he was responsible for interviewing potential employees for open positions at PNC. He was also responsible for managing the operations of the branch, coaching and developing branch employees, customer service (including business banking) and working with PNC's business clients.

{¶ 10} Reusser directly supervised Williams while he worked at the Branch. Williams averred that he "was nothing short of a highly successful employee" in this role.

## B. Williams' Allegations of Reusser's Discriminatory Hiring Comments in Fall 2019

{¶ 11} In or around August 2019, Williams interviewed two applicants for an open position at the Branch. One was an African American male with a long history of banking experience; the other was a Caucasian female with no history of banking experience. Williams expressed to Reusser that he wanted to hire the African American male for the open position but Reusser said she did not want PNC to hire him. Williams described that Reusser told him she did not see previous banking experience as necessary because she "could mold the individual that she felt was the right fit for masculine clients and high net worth clients." Williams said she told him she wanted to hire the female candidate. Williams admitted that Reusser never said she wanted to hire the candidate because she was Caucasian or did not want to hire the African American candidate because he was not Caucasian. But Williams implied that it was no coincidence that the individuals that Reusser felt she could mold "just happened to be Caucasian individuals."

{¶ 12} Reusser testified that Williams interviewed candidates for the open position and that they discussed those candidates together. Reusser said that Williams told her he had interviewed a candidate that had worked at an external bank, really liked the candidate and wanted her to speak with him; she said she knew that the candidate was male but did not know the candidate's race and never met him. Reusser testified that she was willing to meet with the candidate and worked with PNC's recruiter to reach out and schedule him for an interview. She said the candidate never responded to their attempts and the female candidate applied while

they were waiting. She said the female candidate interviewed for the position and Reusser and Williams had "a good conversation about the things that she could bring * * * to his branch." She said Williams shared some concerns about the candidate and expressed that he still wanted Reusser to interview the male candidate. Reusser said she later followed up with Williams to let him know that the male candidate never got back to PNC's recruiter. She said she told Williams that "we can continue to wait, or we have another really great candidate here that we can move forward with."

{¶ 13} Williams said he was not aware that the recruiting department at PNC had difficulty contacting the African American candidate. Williams first testified that the candidate told him he interviewed with Reusser in late September 2019 but later said that Reusser "did not even take the time to interview" him; he ultimately testified that he was not sure whether or not she had interviewed the candidate.

{¶ 14} PNC hired the female candidate. Williams admitted that he made the decision to hire the female candidate but testified that he did so "at [Reusser's] recommendation and * * * with me not wanting to go against her will in fear of retaliation." Williams testified that the female candidate struggled at work and was incompetent, forcing Williams to divert resources to help her. Reusser admitted that Williams told her the female candidate "wasn't catching on as quickly as he had anticipated or he wanted her to."

{¶ 15} In or around September 2019, Williams interviewed a Persian male for an open position at the Branch. The candidate had at least three years of

experience working at PNC. Williams wanted to hire this candidate. Williams also interviewed a Caucasian female. Reusser told Williams that she wanted him to hire the female. According to Williams, Reusser said that clients would not accept the Persian male because of his national origin and race. Reusser said that the female would be better for PNC in the "long term."[3] Williams ultimately hired the Persian male.

{¶ 16} After the September interviews, Williams testified that Reusser treated Williams differently, including stating that Williams was still "on call" on the weekends even though he was off the clock.

### C. PNC Bank's Policies

{¶ 17} Yolanda Reid, who is African American, has been a vice president and senior employee relations investigator for PNC since around March 2017.

{¶ 18} PNC maintains a Fidelity Bonding policy. Reid averred[4] that the policy states, among other things, the following:

> PNC employees are expected to be truthful and honest at all times when working for and/or representing PNC. * * * PNC employees must be covered by PNC's fidelity bond from the first day of employment and must remain covered throughout the duration of their employment. If

---

[3] PNC and Reusser deny this. Reusser testified that "[w]e have a very diverse staff at Chagrin-Brainard" and denied expressing concerns about whether clients would accept the Persian candidate based on the way he spoke or looked. She admitted that she did express concerns to Williams about the candidate but said these concerns were about his performance as a PNC employee, not his race or national origin. For purposes of considering the defendants' summary-judgment motion, we resolve this factual dispute in Williams' favor.

[4] PNC attached a copy of this policy to its motion for summary judgment but the poor quality of the document scan renders it practically illegible. Williams does not dispute Reid's recitation of the policy's language.

not bonded, the individual cannot continue to be employed by PNC. * * * Dishonest acts violate the bond, regardless of whether there is actual monetary loss, and in such instances employment with PNC will likely be terminated.  * * * If PNC believes you may have committed a dishonest act, you automatically are not bonded and you cannot remain at work.

{¶ 19} PNC also maintains a Code of Business Conduct and Ethics.

{¶ 20} Reid averred that these policies state that PNC employees who "'believe another employee has engaged in a dishonest act' are 'obligated to report it * * *.'"  She averred that an employee who fails to make a required report of suspected dishonesty is subject to corrective action "up to and including termination."

{¶ 21} Williams admitted that his conduct as a PNC employee was governed by a number of corporate policies, including PNC's Code of Business Conduct and Ethics and its Fidelity-Bonding Policy.  He admitted that he knew how to access these policies on PNC's intranet.  He further admitted that he was required to review PNC's Code of Business Conduct and Ethics on a yearly basis.  He admitted that PNC's Fidelity-Bonding Policy required him to be honest at all times while working for PNC.  Williams further admitted as follows:

Q. Would you agree with me that being dishonest about client referrals is prohibited under PNC's code of business conduct and ethics?

A. Yes.

Q. Would you agree with me that being dishonest about multichannel calls is prohibited under PNC's codes of business conduct and ethics?

A. Yes.

Q. In fact, any form of dishonesty is prohibited under PNC's code of business conduct and ethics, correct?

A. Yes.

**D. PNC's Investigation and Termination of Williams**

{¶ 22} In September 2019, PNC investigated two allegations of dishonesty regarding Williams. The first allegation involved alleged falsification of multi-channel call logs and the second allegations involved alleged improper client referrals to obtain commissions to which he was not entitled.

### 1. Multi-Channel Calls

{¶ 23} The first allegation was raised initially by Deborah Adams, a sales and service support manager for PNC. Reusser testified that Adams is Caucasian.

{¶ 24} Reusser related that Williams received a list of customer "leads" every month that he was required to call at least three times. These are referred to as "multi-channel calls." The purpose of these calls was to "invite [current and prospective customers] in to have a full cash flow conversation with the client to be able to make sure that we are * * * servicing our customer * * * to their financial wellness and make sure that we are taking care of them and using the right products and services to help meet and achieve their needs and goals." Williams was required to document the disposition of these "dials" in a computer system. The dispositions included, among others, "bad number," "no contact," "contact no appointment" and "contact appointment accepted." If Williams identified that there was a bad number, he should have closed out the lead as "bad number." If he did not reach the customer lead after three attempts, he was supposed to close out the lead. At the

time, Williams was not permitted to make sales over the phone. If a customer walked into the bank, Williams was not permitted to document that walk-in as if he had called the customer. After 90 days, a new business customer would become eligible to be added to the list of multi-channel leads.

{¶ 25} In September 2019, Adams was physically present at the Chagrin-Brainard Branch. She sat in the same room as Williams while Williams was making multi-channel calls. Thereafter, Adams contacted Reusser to report concerns that Williams was not documenting calls correctly and reporting calls that should not have been reported at all.

{¶ 26} Reusser stated that, for example, Williams reported that he made two calls, within two minutes of each other, in which he "picked up the phone, called, contacted the customer, made an appointment, conducted an appointment, and status of sale * * *." She said it was impossible for Williams to have done all this on two separate calls within two minutes, especially because Williams was not permitted to make sales over the telephone. As another example, Reusser described that Williams opened a couple accounts for customers and then reported calls to those customers the next day. On another occasion, she said Williams reported that he made a call to a customer and scheduled an appointment, when in reality the appointment was for a loan closing and it had been scheduled for him. On another occasion, she said Williams documented a "bad number" in the system, then reported a call to the same number the following week and documented "no contact."

{¶ 27} Adams sent Reusser additional information and documentation via email regarding her concerns. Among other things, Adams noted that Williams reported two dials to the same business and reported dials for two accounts that were opened the previous day. She also wrote that she asked Williams whether he was recording walk-in contacts as multi-channel call appointments and he answered, "I don't know."

{¶ 28} Reusser testified that she does not recall coaching or disciplining any other PNC employee for failing to properly log multi-channel calls as a regional manager.

{¶ 29} Reusser admitted that she never spoke with any of the customers to whom Williams reported calls that Adams suspected were false.

## 2. Business Banking Referrals

{¶ 30} The day after Adams reported her concerns to Reusser about multi-channel calls, Heather Dodig — a business banking sales manager whom Reusser said is Caucasian — called her to report a concern that a business banker suspected Williams may have improperly claimed referrals for a client that the business banker was supporting.

{¶ 31} Reusser related that a branch manager who identifies through a casual conversation with a client that the client has a banking need between $1 million and $5 million should refer that client to a business banker. In doing so, the branch manager should put a referral into the computer system and route that referral to the business banker supporting that particular branch. Branch managers

receive a commission when their referrals result in business for the bank.  To make a referral, a branch manager must personally have a conversation with a client and uncover a need that can only be fulfilled by another person and the referral cannot be inappropriate.

{¶ 32} If a branch manager identifies that a person has a business entity with a sufficient business-banking need and makes a referral, the manager receives a commission based on that one entity only, even if the business banker identifies that the client has additional business entities that also have banking needs.  If the branch manager identifies, say, ten business entities that have sufficient banking needs, the branch manager can make a referral for each entity and receive a commission but they have to do so within the referral window and the "referral has to be entered prior to the business banker opening any of the relationships or any of the products and services associated with them, as well."

{¶ 33} Reusser explained that the computer system allows managers to enter a referral not to an identified business banker but to an account called "Admin."[5]

{¶ 34} Dodig reported to Reusser that a business banker — Brad Angeloff — noticed that Williams entered referrals for six business entities associated with a particular customer, with whom he said Williams was not involved.  Dodig reported

---

[5] Reusser did not know specifically why this was an available option but speculated that it may be used by PNC's Care Center.

that Williams had directed the referrals to "Admin," as opposed to Angeloff, and therefore, the system would not send an email to Angeloff.

{¶ 35} Williams testified as follows about these referrals:

Q. Under PNC's policies, when should an employee submit a referral for a client?

A. I don't recall what the policy is as far as submitting a referral for a client.

* * *

Q. Why didn't you submit those referrals directly to [the business banker]?

A. I don't recall.

{¶ 36} Williams testified that he referred the client to the business banker regarding at least six businesses the client was operating at the time. Williams admitted that "[w]hen I initially made the referral, I did not, which was customary, receive any specific details about the business, the number of businesses, or the value of potential services, other than generally knowing that it fit within the proscribed bracket for a business banker to handle." Williams admitted that, at the time he spoke to the business banker about the client's businesses, "no profile had been built for [the client], nor the several businesses that would potentially be involved in any business banking services offered by PNC."

{¶ 37} Williams further testified that, even though he did not set up any accounts for the client's businesses or even know how many businesses would need business-banking services, "I was entitled to the financial incentive that came with that referral" if any business ended up receiving PNC's services.

{¶ 38} After receiving these reports from Adams and Dodig, Reusser called PNC's employee-relations staff and "shared with them the concerns that were brought to my attention" and asked "that somebody needed to look into [it] to make sure that everything was okay."

### 3. Investigation and Termination

{¶ 39} Reid testified that PNC's Employee Relations Information Center took a report regarding Williams and assigned the investigation to her in September 2019. The report involved two primary allegations: (1) Williams may have been falsifying his log of required customer calls and (2) Williams may have improperly entered business referrals for client accounts that he was not involved with generating and directing those referrals in a way that was designed to avoid detection by the banker who actually generated the business. Reid said she spoke with Reusser about the allegations made in the report.

{¶ 40} After Reid was assigned to the investigation, Reusser did not have much of a role in the investigation. Reusser did not recall discussing the allegations with Dodig or Adams after September 12, 2019. Reid kept Reusser informed when interviews were scheduled and Reusser also responded to Reid's requests for documents.

{¶ 41} Reid never spoke with any of the clients associated with any of the multi-channel calls. Reid admitted that she was aware that Williams had been in the Banking & Business Center Manager role for at least nine months and would have been performing multichannel calls and setting appointments throughout that

time. She admitted that she did not investigate whether Williams had incorrectly logged or not entered information correctly as to similar calls in those nine months.

{¶ 42} Reid never spoke with the business customer who had the six accounts for which Angeloff claimed Williams improperly entered referrals.

{¶ 43} Reid interviewed Adams, Angeloff, Dodig and Williams and reviewed the documents assembled by Adams and Dodig regarding their concerns. Based on this investigation, Reid concluded that Williams had engaged in wrongdoing by falsifying his multi-channel call logs and improperly claiming credit for these referrals.

{¶ 44} PNC's employee-relations staff, including Reid and Reid's manager, after consulting with the legal department, recommended to Reusser that Williams be terminated as a result of the investigation's findings. Reusser recalled that Reid told her that PNC had concluded that there were falsifications in Williams' reports of his appointments and dials and that there were inappropriate referrals entered into the system on the six customers Dodig identified. Reusser also recalled that Reid said there were "discrepancies in between what occurred and what [Williams] had reported, so that they were recommending that we terminate [Williams.]" Reusser concurred with the recommendation.

{¶ 45} PNC terminated Williams' employment on October 9, 2019. PNC told Williams that it was terminating him for falsifying information in regard to counting appointments and manipulating incentive programs.

{¶ 46} Reusser assigned another PNC branch manager, who is Caucasian, to cover the Chagrin-Brainard branch on an interim basis while she worked to hire Williams' replacement. The interim manager continued managing his own branches but he worked at the Chagrin-Brainard branch at least two days a week. Approximately three months after Williams' termination, Reusser hired an external candidate, who was also Caucasian, to be the permanent branch manager at the Chagrin-Brainard branch.

### E. Williams Filed Suit and the Trial Court Granted the PNC Defendants' Motion for Summary Judgment

{¶ 47} Williams filed a two-count complaint in November 2020 alleging that PNC and Reusser violated the Ohio Civil Rights Act, R.C. Chapter 4112. Specifically, Williams alleged that (1) the defendants discriminated against him during his employment and terminated him because of his race and (2) the defendants' termination of Williams' employment constituted retaliation for his opposition to the defendants' alleged discriminatory conduct.

{¶ 48} The defendants filed a motion for summary judgment. Williams filed a brief in opposition, attaching an affidavit he executed and certain of the PNC Defendants' written discovery responses. The trial court granted the motion.

{¶ 49} Williams appealed, raising the following sole assignment of error for review:

> The trial court committed reversible error in granting summary judgment by determining that Williams failed to raise a genuine issue of material fact regarding the fourth element of his prima facie case for race discrimination.

{¶ 50} Williams only claims error as to his race-discrimination claim; he did not appeal the trial court's summary judgment as to his retaliation claim.

## II. Law and Analysis

{¶ 51} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, in viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 52} In a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate their entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

### A. The Trial Court Erred When It Determined That Williams Had Not Established a Prima Facie Case of Racial Discrimination

{¶ 53} Williams asserted a claim of racial discrimination in violation of the Ohio Civil Rights Act, R.C. 4112.02(A). Under R.C. 4112.02(A), it is "an unlawful

discriminatory practice" "[f]or any employer, because of the race, color * * * or ancestry of any person, to discharge without just cause * * * or otherwise to discriminate against that person with respect to * * * tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Because discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") are analogous to claims under the Ohio Civil Rights Act, we may look to federal cases interpreting Title VII to assist us in interpreting Ohio law. *E.g.*, *Crable v. Nestle USA, Inc.*, 8th Dist. Cuyahoga No. 86746, 2006-Ohio-2887, ¶ 23, citing *Plumbers & Steamfitters Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 168 (1981).

{¶ 54} A plaintiff may prove intentional race discrimination in employment (1) by direct evidence that a termination or other adverse employment decision was motivated by race or (2) indirectly, by circumstantial evidence, using the burden-shifting method articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by the Ohio Supreme Court in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), and *Plumbers & Steamfitters Joint Apprenticeship Commt.* at 192, and modified in *Coyell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781.

{¶ 55} In this case, there is no direct evidence of racial discrimination against Williams. While Williams alleges that Reusser pressured Williams to make hiring decisions at his branch, at least one being based explicitly on the race of the

job applicant, Williams has presented no evidence linking these alleged discriminatory statements to his termination. *See Hardy v. The Andersons, Inc.*, 6th Dist. Lucas No. L-21-1218, 2022-Ohio-3357, ¶ 26. Accordingly, Williams needed to prove discrimination using the indirect method of proof.

{¶ 56} In the absence of direct evidence of discrimination, we analyze racial-discrimination claims under a burden-shifting framework. *E.g.*, *Smith v. ExpressJet Airlines, Inc.*, 8th Dist. Cuyahoga No. 101336, 2015-Ohio-313, ¶ 13. The plaintiff bears the initial burden to set forth a prima facie case of discrimination. *E.g., id.* If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence showing a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.*, citing *Mosley v. Cuyahoga Cty. Bd. of Mental Retardation*, 8th Dist. Cuyahoga No. 96070, 2011-Ohio-3072, ¶ 64. If the employer articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the proffered reason was not the true reason for the adverse employment action. *See id.*

{¶ 57} Williams contends that the trial court used the wrong test to consider whether he met his prima facie case of discrimination. He claims that, under the correct standard, he meets the prima facie case. We agree.

{¶ 58} Williams urged the trial court to adopt the elements as set forth in *Scovill*, 6 Ohio St.3d at 148, 451 N.E.2d 807, which would require the trial court to consider whether Williams showed that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position in question and (4) he

was replaced by, or his discharge permitted the retention of, a person who did not belong to the protected class. Williams also told the trial court that the fourth element could be met in the alternative by showing that a comparable non-protected person was treated more favorably, pointing to *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 385, 701 N.E.2d 1023 (8th Dist.1997).

{¶ 59} The PNC Defendants urged the trial court to consider whether Williams met the elements set forth in *Birch v. Cuyahoga Cty. Probate Court*, 173 Ohio App.3d 696, 704, 2007-Ohio-6189, 880 N.E.2d 132 (8th Dist.), which would require Williams to demonstrate that (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action despite his qualification and (4) he was treated less favorably than a similarly situated individual outside the protected class.

{¶ 60} The trial court agreed with the PNC Defendants and concluded that summary judgment against Williams was appropriate because Williams could not identify any similarly situated individual outside of his protected class who was treated more favorably than himself.

{¶ 61} "[D]emonstrating a prima facie case does not present an onerous burden, as a prima facie case merely permits a rebuttable presumption of discriminatory treatment." *Hardy*, 2022-Ohio-3357, at ¶ 34. It is well-settled that a plaintiff can meet the fourth element of their prima facie case for race discrimination based on a termination by showing that they were replaced by a person outside of the protected class. *See, e.g., Blanton v. Cuyahoga Cty. Bd. of*

*Elections*, 150 Ohio App.3d 61, 2002-Ohio-6044, 779 N.E.2d 788 (8th Dist.), ¶ 17–19; *McGowan v. Cuyahoga Metro. Hous. Auth.*, 8th Dist. Cuyahoga No. 84041, 2004-Ohio-4070, ¶ 4; *Jenkins v. Regents of the Univ. of Michigan Health Sys.*, 763 Fed.Appx. 545, 550 (6th Cir.2019); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–583 (6th Cir.1992); *Kenner v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, 88 NE.3d 664 (10th Dist.), ¶ 27; *Boyd v. Ohio Dept. of Mental Health*, 10th Dist. Franklin No. 10AP-906, 2011-Ohio-3596, ¶ 26; *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 780, 2003-Ohio-5340, 798 N.E.2d 1141 (10th Dist.); *Drummond v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 21AP-327, 2022-Ohio-1096, ¶ 14 (discussing a claim of racial discrimination based on a failure-to-hire-or-promote theory); *Rice v. Cuyahoga Cty. DOJ*, 2005-Ohio-5337, 970 N.E.2d 470, ¶ 41 (8th Dist.) (discussing a claim of racial discrimination based on a failure-to-promote theory); *Huffman v. Sunbelt Rentals, Inc.*, 1st Dist. Hamilton No. C-190642, 2020-Ohio-5070, ¶ 20; *Swann v. Cardiology Assocs. of Cincinnati*, 1st Dist. Hamilton No. C-050650, 2006-Ohio-2758, ¶ 26; *James v. Bob Ross Buick, Inc.*, 167 Ohio App.3d 338, 2006-Ohio-2638, 855 N.E.2d 119, ¶ 32 (2d Dist.); *Grooms v. Supporting Council of Preventative Effort*, 157 Ohio App.3d 55, 62–63, 2004-Ohio-2034, 809 N.E.2d 42 (2d Dist.); *Smith v. Goodwill Indus.*, 130 Ohio App.3d 437, 441–442, 720 N.E.2d 203 (2d Dist.1998); *Farris v. Port Clinton City School Dist.*, 6th Dist. Ottawa No. OT-05-041, 2006-Ohio-1864, ¶ 60.; *but see Isbell v. Johns Manville, Inc.*, 6th Dist. Lucas No. L-06-1240, 2007-Ohio-5355, ¶ 40; *Rivers v. Cashland Fin. Servs.*, 9th Dist. Summit No. 26373, 2013-Ohio-1225, ¶ 16.

{¶ 62} Here, there is no dispute that Williams was a member of a protected class, that the PNC Defendants terminated him, that he was qualified for the position he held or that he was replaced by a person outside of Williams' protected class. Therefore, Williams readily meets the prima facie case for discrimination.

## B. We Are Permitted to Consider the Other Issues Relevant to the Determination of Whether the PNC Defendants are Entitled to Summary Judgment

{¶ 63} Williams urges us not to consider the remainder of the burden-shifting analysis because the trial court did not address the remainder of the analysis in its written opinion explaining its grant of summary judgment. Williams would have us simply reverse and remand the matter for the trial court to consider the remainder of the analysis. We acknowledge that there is some nonbinding authority supporting Williams' position but, after careful consideration, we conclude that our standard of review is not so limited.

{¶ 64} As an initial matter, a trial court need not set forth any detailed reasoning in an opinion granting summary judgment. *Ferguson v. Univ. Hosps. Health Sys., Inc.*, 8th Dist. Cuyahoga No. 111137, 2022-Ohio-3133, ¶ 68–71, fn. 12 (collecting cases). Where a trial court considers two independent grounds for summary judgment, finding one persuasive and declining to consider the other, we are skeptical that our ability to consider both grounds would be dependent on whether the trial court chooses to set forth reasoning for its decision.[6]

---

[6] The Supreme Court of Texas briefly adopted such a rule, holding in a plurality opinion in 1993 that an appeals court should review all properly raised grounds if the trial court set forth no specific reasoning for granting a summary judgment but saying that if

{¶ 65} In support of his argument, Williams points us to the Ohio Supreme Court's opinion in *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 585 N.E.2d 384 (1992). In *Bowen*, the plaintiffs sued a racetrack for alleged injuries sustained during an automobile race and the trial court granted summary judgment in favor of the racetrack, finding that one of the plaintiffs signed a release that precluded recovery. *Bowen* at 86–87, syllabus. On appeal, the plaintiffs asked the Supreme Court to find that the release did not preclude recovery and, further, to hold that a second, separate release also did not preclude recovery. The Supreme Court declined to determine whether the second release precluded recovery because "the trial court specifically declined to address the ambiguity (if any) of the [second] release" and "the question whether the [second] release was enforceable was not properly before the court of appeals." *Bowen* at 89. The court reasoned that "since the judgment of the trial court was based solely on the validity of the [first] release, we find that the judgment of the court of appeals must have been based solely on the validity of that release as well." *Bowen* at 88, fn. 5. Initially, we note that only three justices concurred in full with the specific language of the *Bowen* opinion.[7] Next, we note

the trial court rested its judgment on a specific ground, the appeals court should review only that ground and decline to consider alternate grounds. *State Farm Fire & Casualty Co. v. S.S.*, 858 S.W.2d 374 (Tex.1993). But the court reconsidered this approach three years later and held that an appeals court may consider all grounds preserved for review. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996).

[7] Justices Douglas, Sweeney and Resnick concurred in the opinion. Justice Brown concurred only with the syllabus and judgment. Justice Moyer concurred only with the syllabus, dissenting to the judgment. Justices Holmes and Wright concurred in part and dissented in part, calling the relevant portion of the opinion dicta.

that the second release was not included in the appellate record, although the parties had stipulated to the gist of the release. *Bowen* at 85, fn.2. And finally, we note that the Supreme Court more recently affirmed a summary judgment on an alternative basis not considered by the trial court, calling into question the validity of reading *Bowen* to stand for the proposition that an appeals court cannot consider alternative arguments for the first time. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161.

{¶ 66} In *Argabrite*, the court reviewed a summary judgment in favor of several law-enforcement officers. *Argabrite* at ¶ 4–5. The officers had asserted two distinct grounds in support of summary judgment, the trial court granted summary judgment based on one of those grounds and the intermediate appeals court affirmed based on that ground. *Id.* The Supreme Court found that granting summary judgment on that basis was error. *Id.* at ¶ 12. Nevertheless, noting the de novo standard of review, the court determined that it *must* consider the officers' second asserted argument for summary judgment because the officers had raised the argument before the trial court. *Id.* at ¶ 14–15. The court affirmed the summary judgment based on that second, alternative argument.[8] *Id.* at ¶ 17, 32.

---

[8] Two justices dissented in part and would decline to affirm the summary judgment on alternate grounds, at least as to some of the defendants. *See id.* at ¶ 79–80 (Pfeifer, J., concurring in part and dissenting in part) ("Extraordinary circumstances * * * must be present for this court to reach a decision on summary judgment when the trial court applied the wrong standard. * * * We are loathe to substitute our judgment for that of lower courts that have been guided by a correct legal standard, and we should positively recoil at inserting our judgment when a lower court has not had the opportunity to apply the proper legal standard."); *id.* at ¶ 84 (O'Neill, J., concurring in part and dissenting in part) ("I disagree * * * with the majority's decision to weigh the evidence and grant

{¶ 67} To the extent that *Bowen* retains any precedential value as to the correct resolution of this issue, it is distinguishable. The trial court in the case before us did not specifically decline to address the remainder of the burden-shifting analysis. Moreover, the parties agree that discovery is complete and the issues were fully briefed. The evidence both sides rely on at the summary judgment stage is in the record.

{¶ 68} Williams' argument finds more support among the intermediate courts of appeals; he points us to several cases from other appellate districts.[9] This line of cases largely relies on *Bowen*, 63 Ohio St.3d 84, 686 N.E.2d 384, which we discussed above, and the Ohio Supreme Court's opinion in *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 604 N.E.2d 138 (1992). In *Murphy*, the court reversed a summary judgment when the trial court admittedly ruled solely based on the parties' oral argument, without reviewing the summary-judgment briefing or the evidence in the record. *Murphy* at 360. *Murphy* makes clear that Civ.R. 56(C) requires the trial court to "thoroughly examine all appropriate materials filed by the

---

summary judgment in favor of law enforcement. * * * [The plaintiff] deserves to have her motions and pleadings reviewed by the trial court using the correct legal standard.").

[9] *Bohl v. Travelers Ins. Group*, 4th Dist. Washington No. 03CA68, 2005-Ohio-963, ¶ 21–23; *Bartkowiak v. Pillsbury Co.*, 4th Dist. Jackson No. 99 CA 844, 2000 Ohio App. LEXIS 86, 16–17; *Yoskey v. Eric Petroleum Corp.*, 7th Dist. Columbiana No. 13 CO 42, 2014-Ohio-3790, ¶ 40; *Orvets v. Natl. City Bank*, 131 Ohio App.3d 180, 192–194, 722 N.E.2d 114 (9th Dist.1999); *B.F. Goodrich Co. v. Commercial Union Ins.*, 9th Dist. Summit No. 20936, 2002-Ohio-5033, ¶ 38–44; *Guappone v. Enviro-Cote, Inc.*, 9th Dist. Summit No. 24718, 2009-Ohio-5540, ¶ 11–13; *Lehmier v. Western Reserve Chemical Corp.*, 9th Dist. Summit No. 28776, 2018-Ohio-3351, ¶ 49. We also note *Young v. Univ. of Akron*, 10th Dist. Franklin No. 06AP-1022, 2007-Ohio-4663, ¶ 22, and *Sad Adlaka v. New York Life Ins. & Annuity Corp.*, 7th Dist. Mahoning No. 13 MA 171, 2015-Ohio-605.

parties before ruling on a motion for summary judgment." *Id.* If the trial court fails to do so, *Murphy* holds there is reversible error notwithstanding that an appellate court would review the judgment de novo. *Id.*

{¶ 69} After careful consideration of the nonbinding conclusions reached by our sister districts and with due respect to them, we are persuaded that we may consider the remainder of the burden-shifting analysis here. As an initial matter, while we acknowledge the out-of-district cases mustered by Williams, we note that other panels in many of those districts have come out the other way. *See Carpenter v. Long*, 196 Ohio App.3d 376, 2011-Ohio-5414, 963 N.E.2d 857 (2d Dist.), ¶ 61; *Bank of N.Y. Mellon v. Huth*, 6th Dist. Lucas Nos. L-12-1241 and L-12-1283, 2014-Ohio-4860, ¶ 41; *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41–42, 654 N.E.2d 1327 (9th Dist.); *Hall v. Circle K*, 10th Dist. Franklin No. 12AP-900, 2013-Ohio-3793, ¶ 5; *Oliveri v. Osteostron*, 2021-Ohio-1694, 171 N.E.3d 386 (11th Dist.), ¶ 28; *Reo v. Allegiance Admrs. LLC*, 11th Dist. Lake No. 2017-L-112, 2018-Ohio-2464,

¶ 25.    Courts in many other jurisdictions have too,[10] although certainly not unanimously.[11]

{¶ 70} Because our review of a trial court's grant of summary judgment is de novo, we review the evidence "as if for the first time." *Argabrite*, 149 Ohio St.3d at 353, 2016-Ohio-8374, 75 N.E.3d 161.  We afford no deference to the trial court's

[10] *E.g.*, *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir.2003) (appellate court may affirm a summary judgment on alternate grounds, but it normally will not do so when the alternate ground is first raised on appeal, because "[f]airness demands that a party be given an appropriate opportunity to present evidence on each aspect of her claim before suffering an adverse entry of summary judgment"); *Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir.1995) (appellate court may affirm on alternate grounds as long as they supported by the record); *Richmond v. Higgins*, 435 F.3d 825, 828 (8th Cir.2006) ("Although the district court did not address [the defendant's] alternative grounds for summary judgment, this court may affirm on any basis supported by the record."); *G & G Closed Circuit Events, LLC v. Zihao LIU*, 45 F.4th 1113, 1117 (9th Cir.2022); *Seay v. Oklahoma Bd. of Dentistry*, 10th Cir. No. 21-6054, 2022 U.S. App. LEXIS 8717 (Apr. 1, 2022) (noting that the appellate court has discretion to affirm on any ground adequately supported by the record and exercises that discretion after considering whether (1) the ground was fully briefed and argued on appeal and below, (2) the parties have had a fair opportunity to develop the factual record and (3) the appellate decision would only involve questions of law in light of factual findings to which the appeals court defers or uncontested facts); *Wilburn v. Robinson*, 480 F.3d 1140, 1148–1149 (D.C. Cir.2007) (appellate court has discretion to uphold a summary judgment on legal theory different from that relied upon by the trial court, resting the affirmance on any ground that finds support in the record); *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992); *Brocato v. Mississippi*, 503 So.2d 241, 244 (Mississippi 1987); *Hayes v. A.J. Assocs., Berrett v. State*, 420 P.3d 140, 147 (Utah Ct.App.2018); *Alpine Haven Property Owners Assn., Inc. v. Deptula*, 175 Vt. 559, ¶ 10, 830 A.2d 78.

[11] For example, Maryland still employs a "general rule" against affirming a summary judgment on alternative grounds but allows for certain exceptions.  *Irwin Indus. Tool Co. v. Pifer*, 276 A.3d 533, 478 Md. 645 (Md.2022).  The U.S. Circuit Court for the D.C. Circuit has acknowledged having discretion to affirm a summary judgment on alternative grounds not decided by the trial court but it has "'cautioned that it usually will be neither prudent nor appropriate'" to do so.  *PHCDC1, LLC v. Evans & Joyce Willoughby Trust*, 257 A.3d 1039, 1045 (D.C.2021), quoting *Jaiyeola v. District of Columbia*, 40 A.3d 356, 372 (D.C.2012).  A justice on the Mississippi Supreme Court colorfully expressed the opinion that summary-judgment rules "should not provide a buffet platter from which this Court might select the most palatable dish to stuff a litigant's hopes of a trial down his throat."  *Brocato* at 246.

decision and independently review the record to determine whether summary judgment is appropriate. It is as if the motion and evidence therein is first reviewed at the appellate level. *Grafton*, 77 Ohio St. 3d at 105, 671 N.E.2d 241; *Argabrite* at ¶ 14.

{¶ 71} Finally, "a reviewing court is not authorized to reverse a correct judgment merely because it was reached for the wrong reason." *E.g.*, *State v. Hale*, 8th Dist. Cuyahoga No. 103654, 2016-Ohio-5837, ¶ 15. A judgment that "'achieves the right result for the wrong reason'" is not prejudicial and will be affirmed. *O'Neal v. State*, 2020-Ohio-506, 146 N.E.3d 605, ¶ 20 (10th Dist.), quoting *Reynolds v. Budzik*, 134 Ohio App.3d 844, 732 N.E.2d 485 (6th Dist.1999).

{¶ 72} Moreover, to hold otherwise would be to practically encourage trial courts to grant summary judgment without issuing any opinion at all. As we recently observed:

> Appellate courts do not afford these opinions any deference, but an opinion facilitates our review and allows litigants to focus their arguments before us. Providing a written opinion also "helps to promote confidence in the justice system to those who otherwise might feel that their case was given no consideration." *CitiMortgage, Inc. v. Tillman*, 9th Dist. Lorain No. 17CA011090, 2018-Ohio-629, ¶ 16 (Callahan, J., dissenting).

(Citations omitted.) *Ferguson*, 2022-Ohio-3133, at ¶ 72.

{¶ 73} While we are authorized and, indeed, encouraged to consider alternative grounds in many cases, it is not appropriate to do so in every case. We need not decide on this appeal all the circumstances in which it is more appropriate to remand. But, because Williams asks us to remand based on our decision in

*Meekins v. Oberlin*, we address our consideration of that precedent. *Meekins*, 8th Dist. Cuyahoga No. 106060, 2018-Ohio-1308.

{¶ 74} In *Meekins*, our court considered a trial court's summary judgment in favor of the city of Oberlin on a plaintiff's claims under state law and 42 U.S.C. § 1983. *Meekins* at ¶ 12, 15. The trial court had granted summary judgment to Oberlin on the basis of statutory political-subdivision immunity. *Id.* at ¶ 17. After concluding that Oberlin was not entitled to statutory immunity as to the plaintiff's claims under 42 U.S.C. § 1983, *id.* at ¶ 21, our court considered Oberlin's argument that we could nevertheless affirm the summary judgment on one or more separate alternative bases in light of the evidence mustered by the parties. Our court declined to do so, noting as follows:

> It is clear from the record that the trial court never reviewed the evidence presented by the parties on summary judgment * * *. The only issue considered by the trial court in ruling on Oberlin's motion for summary judgment was whether [the plaintiff's] claims were barred by political subdivision immunity * * * — a legal issue that did not involve review and consideration of the evidence submitted by the parties on summary judgment.

*Id.* at ¶ 24.

{¶ 75} Our court remanded the matter for the trial court to review the parties' evidence and determine, in the first instance, whether genuine issues of material fact exist with respect to Oberlin's liability under 42 U.S.C. § 1983. *Id.* at ¶ 26.[12]

---

[12] On remand, the trial court again granted summary judgment for Oberlin. This time (perhaps not surprisingly considering our court's opinion in *Meekins*), it did so without explaining the reasoning for its decision. *Meekins v. Oberlin*, 8th Dist. Cuyahoga

{¶ 76} This approach is consistent with the holding in *Murphy*, 65 Ohio St.3d 356, 604 N.E.2d 138, as the trial court granted summary judgment while leaving the parties' folders of evidence unopened. In *Murphy*, the trial court did so because it was convinced based solely on oral argument. In *Meekins*, the trial court did so because it was convinced that the case could be decided based on statutory immunity, no matter what the evidence was. Because we determined that the trial court's holding in *Meekins* was erroneous, we were left with a summary judgment that was not based on any review of the evidence at all — in other words, a summary judgment issued in violation of Civ.R. 56(C).

{¶ 77} This approach is consistent with *Murphy*, *Argabrite*, 149 Ohio St.3d 349, 75 N.E.3d 161, and *Browne v. Artex Oil Co.*, 158 Ohio St.3d 398, 2019-Ohio-4809, 144 N.E.3d 378.

{¶ 78} The situation presented by *Murphy* and *Meekins* — where the record showed that the trial court clearly ignored some Civ.R. 56(C) material because it concluded it did not have to review it — is fundamentally different than the situation presented here. Discovery is complete and both parties fully briefed the entirety of the burden-shifting framework below and marshalled evidence supporting their arguments. The trial court specifically noted that it had reviewed the parties' evidence and exhibits. There is nothing in the record to suggest that it did not do so. We see no reason to remand here.

---

No. 107636, 2019-Ohio-2825. On appeal, our court again reversed the trial court — this time on a consideration of the merits of the plaintiffs' claims. *Id*. at ¶ 61–62.

## C. The PNC Defendants Are Entitled to Summary Judgment

{¶ 79} Having concluded that we may consider the rest of the burden-shifting analysis in this case, we turn to a consideration of whether the PNC Defendants produced evidence of a legitimate, nondiscriminatory reason for terminating Williams and — if they did —whether Williams has shown a genuine dispute for trial as to whether that proffered reason was not the true reason for the adverse employment action.

{¶ 80} The PNC Defendants clearly articulated a legitimate, nondiscriminatory reason for terminating Williams. Williams does not dispute that PNC's policies prohibit dishonesty and that it would violate these policies for a branch manager to falsify their call logs or improperly enter referrals. He also does not dispute that two PNC employees reported allegations that Williams had engaged in dishonesty or that PNC investigated those allegations and found them to be credible. He further does not dispute that the internal investigator PNC assigned to this investigation recommended to Reusser that Williams be terminated as a result of these findings. Reusser and Reid informed Williams that he was being terminated as a result of the findings of this investigation. That proffered reason for terminating Williams was legitimate and nondiscriminatory.

{¶ 81} Williams argues that this stated reason was mere pretext. A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendants' challenged conduct or (3) was insufficient to warrant the challenged conduct. Regardless of which option is

chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation and infer that the employer intentionally discriminated against him. *E.g.*, *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 12. At this step, the employee must show both that the employer's reason was false and that discrimination was the real reason. *E.g.*, *Kenner,* 2017-Ohio-1349, 88 N.E.3d 664, at ¶ 29. The employee must show more than mere conjecture that the employer's stated reason is a pretext for the court to deny the employer's motion for summary judgment. *E.g.*, *Powers v. Pinkerton, Inc.*, 8th Dist. Cuyahoga No. 76333, 2001 Ohio App. LEXIS 138, ¶ 11.

{¶ 82} Williams argues that there are genuine issues of fact as to whether the PNC Defendants' reason had no basis in fact or did not actually motivate the termination. He does not contend that the alleged wrongdoing — if established — was insufficient to warrant termination.

{¶ 83} Williams says it is inherently unbelievable that he would falsify multichannel calls while Adams was sitting in the same room as him and he complains that PNC did not adequately investigate Adams' allegation because it did not contact the customers Williams reported that he called. He contends that, because he denies falsifying his logs, there "is a credibility determination for a jury to make regarding whether the [multi-channel] calls allegation was a legitimate reason to termination Williams, versus a pretextual complaint by Reusser * * *."

{¶ 84} The PNC Defendants responded, among other things, that Williams presented no evidence that he actually made the multichannel calls at issue or that Adams lied about what she said she observed. They defend Reid's investigation of the allegations and state that the findings of wrongdoing were supported by interviews and documentary evidence.

{¶ 85} As for the referrals, Williams argues that PNC and Reusser failed to contact the client to verify what role — if any — Williams played in the opening of the client's accounts. Williams also claims that his "conduct was perfectly consistent with the nature (and limitation) of the [computer] system whereby employees log such referrals." He contends that he could not physically create those referrals before passing the customer along to a business banker "because the customer had at least six different businesses and it was undetermined at that point which businesses, if any, would receive PNC's services."

{¶ 86} PNC responded, that it should not have to "rope" current and prospective clients into its sensitive employment investigations and that even if Williams had a conversation with this business client and received enough information to make one referral for this business client, he did not have enough information to properly refer the client's other businesses to PNC and he did so anyway.

{¶ 87} After a careful review of the record, and viewing the evidence in Williams' favor, we conclude that no reasonable factfinder could find that the PNC Defendants' proffered reason for the termination had "no basis in fact."

{¶ 88} Regarding the multi-channel calls, Williams does not dispute that he logged two calls within two minutes as though he "picked up the phone, called, contacted the customer, made an appointment, conducted an appointment, and status of sale * * *."  He does not rebut Reusser's testimony that it would be impossible to complete all these actions within two minutes or respond to her testimony that Williams was not even permitted to make sales over the phone. Williams does not show how his call logs, which PNC produced, support that he was making multi-channel calls correctly.

{¶ 89} As for the business referrals, Williams admitted that — when he referred the client to Angeloff — he did not "receive any specific details about the business, the number of businesses, or the value of potential services, other than generally knowing that it fit within the proscribed bracket for a business banker to handle."  He further admitted that, at the time he spoke to the business banker about the client's businesses, "no profile had been built for [the client], nor the several businesses that would potentially be involved in any business banking services offered by PNC."

{¶ 90} Reusser testified that, under these circumstances, a branch manager is not permitted to log a referral.  She said that even if a branch manager identifies that a person has a business entity with a sufficient business-banking need and makes a referral, the manager receives a commission based on that one entity only, even if the business banker identifies that the client has additional business entities that also have banking needs.  In other words, in order for Williams to receive credit

for this business client's other entities, he would have needed to gather enough information about each of those entities and their needs to enter specific referrals for each one. Moreover, even if Williams was permitted to claim a referral for each of this client's business entities, he was not permitted to claim a referral after the business banker opened the entities' accounts.

{¶ 91} Williams avers generally that he was permitted to claim credit for all of this client's entities, but he does not specifically dispute any of Reusser's testimony about the qualifications needed to properly claim a referral. When asked about referrals during his deposition, he testified that he did not recall what PNC's policy was regarding when an employee should submit a referral. This is not sufficient to create a material fact for trial. The undisputed evidence is that Williams entered referrals for this business client's entities after Angeloff opened the entities' accounts and without having sufficient contact with the client about the client's needs to merit credit for a referral.

{¶ 92} Therefore, no reasonable juror could conclude that the PNC Defendants' reason for terminating Williams had no basis in fact.

{¶ 93} Williams argues that there is a genuine dispute of material fact as to whether this alleged wrongdoing actually motivated the termination because (according to him) Reusser pressured Williams to hire a Caucasian candidate over an African American candidate for a position at the branch and then pressured Williams to hire a Caucasian candidate over a Persian candidate for a different position, explicitly because of concerns that clients would not accept the Persian

candidate because of his race or national origin. He further argues that the fact that PNC replaced Williams with a Caucasian person "fits the narrative of Reusser wanting to hire and fill her department with Caucasian employees."

{¶ 94} The PNC Defendants dispute those allegations but for purposes of summary judgment they also argue that (1) the PNC Defendants hired Williams into his Branch & Business Center Manager position knowing that Williams was African American; (2) the initial allegations against Williams came from Adams and Angeloff — not Reusser — and Williams does not present evidence that either Adams or Angeloff had discriminatory motives and (3) PNC assigned an investigator who is African American to investigate the allegations and she concluded that Williams did engage in misconduct and recommended termination.

{¶ 95} After a careful review of the record, and viewing the evidence in Williams' favor, we conclude that no reasonable factfinder could find that the PNC Defendants' proffered reason did not actually motivate the termination.

{¶ 96} Williams does not allege that Adams or Angeloff or Dodig — the employees who reported concerns to Reusser — had a discriminatory motive to make a false report or lie to PNC's investigator during her investigation. Williams also does not dispute that Reusser was *required* to report these concerns under PNC's policies. Williams also does not allege that Reid, who investigated these allegations, had a discriminatory motive. He further does not dispute that Reid, after reviewing the documents assembled by Adams and Dodig and interviewing Adams, Angeloff, Dodig and Williams, concluded that Williams did engage in

dishonest conduct and recommended to Reusser that PNC terminate him. To be sure, as Williams states, Reusser was a "part of that [investigation] process and directly involved in the decision-making related to Williams' termination." But Williams produces no evidence to dispute that Reusser's role was limited to (1) making a required report that several employees she supervised alleged that Williams engaged in dishonest conduct, (2) cooperating with the investigation conducted by PNC's investigator — who was African American — and (3) considering whether to accept the investigator's recommendation that Williams be terminated. Reusser exercised some discretion as to the last item but, as we discussed above, Williams has not established a genuine dispute for trial as to whether the investigation's findings of wrongdoing had no basis in fact. No reasonable factfinder could infer pretext from these circumstances.

{¶ 97} We, therefore, overrule Williams' assignment of error.

## III. Conclusion

{¶ 98} Having overruled Williams' sole assignment of error for the reasons stated above, we affirm the summary judgment.

It is ordered that the appellees recover from the appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J. and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR